UNION CARBIDE CORPORATION,
Plaintiff-Appellant,

v.

EVER-READY INCORPORATED, a
corporation, and Mark Gilbert, an
individual, Defendants-Appellees.

No. 75–1371.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 22, 1975.

Decided Jan. 30, 1976.

As Amended on Denial of Rehearing
March 11, 1976.

As Amended March 16, 1976.

Bert A. Collison, William K. Guild, Nims, Howes, Collison & Isner, New York City, for Union Carbide Corp., plaintiff-appellant; John H. Morrison, Kirkland & Ellis, Chicago, Ill., of counsel.

Francis J. McConnell, Richard P. Campbell, Chicago, Ill., for defendants-appellees.

Before CLARK, Associate Justice (Retired),[*] and PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

Union Carbide Corporation brought this action against Ever-Ready Incorporated[1] alleging trademark infringement and unfair competition.[2] In issue on this appeal are 1) whether the district court erred in declaring Carbide's trademark, EVER-EADY, invalid; 2) whether the district court erred in finding that defendants' use of Ever-Ready on electrical products was not likely to cause confusion; and 3) whether the district court erred in holding that defendants' use of Ever-Ready does not constitute unfair competition or dilution under Illinois statutes. In the district court Ever-Ready raised the affirmative defenses of laches and misuse of trademark in violation of the antitrust laws. Prior to trial the antitrust issues were severed for separate trial pursuant to Fed.R.Civ.P. 42(b) and are not involved in this appeal.

In 1898 plaintiff's predecessor, American Electrical Novelty & Manufacturing Company, adopted the term EVER READY to distinguish its products. In 1901 the mark was changed to EVEREADY. In 1909 the company changed its name to American Ever Ready Company, and in 1914 it assigned all its assets to the National Carbon Company, Carbide's predecessor.

Currently plaintiff sells under its trademark, EVEREADY, alone or in combination with other words and designs, an extensive line of electric batteries, flashlights, and miniature bulbs for automobile and marine use. Carbide presently is the owner of five United States trademark registrations on its trademark, EVEREADY, alone, and with other words and distinctive designs. Affidavits have been filed pursuant to 15 U.S.C. §§ 1058 (for continued validity) and 1065 (for incontestability). Carbide has advertised these products extensively and since 1966 has had sales of its EVEREADY products in excess of one hundred million dollars per year. From October 1965 through July 1967 Carbide sold certain bulbs under its EVEREADY mark in blister packages which indicated that they were for high-intensity reading lamps. Carbide has continued to sell identical bulbs packaged for automotive and other uses.

In 1944 defendant Mark Gilbert began business as Ever-Ready Fluorescent Company and still continues to conduct a fluorescent light maintenance service. In 1946 a new company was formed to import and distribute electrical supplies, stationery, gift items, and accessories, including lamps, light bulbs, light fixtures, and flashlights. After several changes of form and name,

---

[*] Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

1. Ever-Ready Incorporated changed its name to Ever-Ready International Ltd. while this action was pending in the district court.

2. The district court found jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1332 and 1338.

this company became the defendant, Ever-Ready Incorporated. The products listed above are primarily distributed under names other than Ever-Ready, although Ever-Ready's promotional material, which is distributed within the trade, contains its corporate logo.

In 1969 defendants commenced importing miniature lamp bulbs having the term Ever-Ready stamped on their bases and selling these bulbs in blister packages containing the term Ever-Ready in a four-sided logo and indicating that they are for high-intensity lamps. Ever-Ready also imports the high-intensity lamps with Ever-Ready stamped on them or on labels attached to them. The literature accompanying the lamps also contains the logo. The name of the manufacturer is also indicated on the lamps.

Carbide sought an injunction against Ever-Ready's use of the term Ever-Ready on or in connection with the advertising or sale of electrical products. Carbide also requested that Ever-Ready be required to deliver up to it all material containing the allegedly infringing marks. No damages were sought. The district court found no infringement, no dilution under Illinois law, no unfair competition, and declared Carbide's mark, EVEREADY, invalid.[3] This appeal followed.

## I. Validity of Plaintiff's Trademark

### A. *Validity is in Issue*

Plaintiff argues that the validity of its mark was not in issue before the trial court and that it was improper for the trial court to address the issue in its opinion. Plaintiff relies on a stipulation entered before trial which stated that plaintiff's registrations were in full force; on the statement of issues, which were part of the pretrial order; and on defendants' proposed findings of facts and conclusions of law, which contained no finding of invalidity.

The stipulation is of little help to plaintiff. That a registration is in force is not necessarily inconsistent with the invalidity of a trademark, for example, where the trademark has become a generic term. At most the stipulation is ambiguous. We are, however, troubled by the failure to include the question of validity in the statement of issues in the pretrial order. Invalidity is, of course, a defense to an infringement action. If the defendants wished to rely on it, it should have been a part of the statement of issues. On the other hand, remarks during trial, at least by defendants' counsel, indicate that validity, was in issue. The trial judge concluded that it was in issue.

Having carefully considered these factors, we conclude that we must face the issue of invalidity. Plaintiff may or may not have been prejudiced before the district court if counsel did not adequately brief or argue the validity of the trademark because he did not view it as in issue; nevertheless, counsel has not shown this court that it was prejudiced because evidence was not introduced which would have been had counsel believed validity was in issue. The legal issues have been fully briefed before this court.

### B. *Effect of Incontestability*

A mark may become "incontestable" if the requirements of 15 U.S.C. § 1065 are met.[4] Defendant does not dispute that Car-

---

**3.** The district court opinion appears at 392 F.Supp. 280.

**4.** "§ 1065. Incontestability of right to use mark under certain conditions.

Except on a ground for which application to cancel may be filed at any time under subsections (c) and (e) of section 1064 of this title, and except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use

bide has complied with the requirements of § 1065 on incontestability but disputes the effect and scope of that achievement. Section 1115 prescribes the effects of registration and incontestability in an infringement action. It provides in relevant part:

"(a) Any registration . . . of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of registrant's exclusive right to use the registered mark in commerce on the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude an opposing party from proving any

legal or equitable defense or defect which might have been asserted if such mark had not been registered.

"(b) If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defenses or defects is established . . .."

Seven defenses then follow, but none are relevant in this appeal.[5]

in commerce, shall be incontestable: *Provided,* That—

(1) there has been no final decision adverse to registrant's claim of ownership of such mark for such goods or services, or to registrant's right to register the same or to keep the same on the register; and

(2) there is no proceeding involving said rights pending in the Patent Office or in a court and not finally disposed of; and

(3) an affidavit is filed with the Commissioner within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and the other matters specified in subsections (1) and (2) of this section; and

(4) no incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise.

Subject to the conditions above specified in this section, the incontestable right with reference to a mark registered under this chapter shall apply to a mark registered under the Act of March 3, 1881, or the Act of February 20, 1905, upon the filing of the required affidavit with the Commissioner within one year after the expiration of any period of five consecutive years after the date of publication of a mark under the provisions of subsection (c) of section 1062 of this title.

The Commissioner shall notify any registrant who files the above-prescribed affidavit of the filing thereof."

**5.** The defenses are:

"(1) That the registration or the incontestable right to use the mark was obtained fraudulently; or

(2) That the mark has been abandoned by the registrant; or

(3) That the registered mark is being used, by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services in connection with which the mark is used; or

(4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin; or

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to registration of the mark under this chapter or publication of the registered mark under subsection (c) of section 1062 of this title: *Provided, however,* That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

(6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: *Provided, however,* That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

(7) That the mark has been or is being used to violate the antitrust laws of the United States."

It is not disputed that the prima facie presumption of § 1115(a) may be used in an infringement action. Contrary to defendants' assertions, nothing in the statute indicates that the conclusive evidence rule of § 1115(b) cannot be used similarly. Three of the defenses enumerated in the section clearly contemplate the use of incontestability in infringement actions by plaintiffs. Subsections 1115(b)(4), 1115(b)(5), and 1115(b)(6) describe situations where a plaintiff's mark shall not be conclusive evidence in infringement actions. This implies that in other situations, assuming none of the other enumerated defenses are applicable, incontestability may be used by a plaintiff in establishing his case. Nevertheless, courts have not given the section uniform treatment. Opinions range from strict to liberal.

Defendants argue that incontestability is a narrow defensive device which cannot be used offensively by a plaintiff in an infringement action. Certainly no such limitation is expressed in the statute, but there is a line of cases which provides support for defendants' position. *John Morrell & Co. v. Reliable Packing Co.,* 295 F.2d 314 (7th Cir. 1961), is procedurally similar to the present case. In *Morrell,* plaintiff, owner of an incontestable registration, sued for statutory trademark infringement, unfair competition, and dilution under an Illinois statute. The essence of the court's holding was that plaintiff had failed to sustain its burden to show a likelihood of confusion between its mark, "E–Z Cut," and defendant's, "Easy-Carve." In reaching this conclusion the court relied on the parties' practices of using these marks in connection with their names (Morrell E–Z Cut and Thompson Farms Brand Easy Carve). Plaintiff had apparently argued that the court could not consider this because its mark was incontestable. The district court did not limit its discussion to holding that confusion was not likely, but cited language in *Rand McNally & Co. v. Christmas Club,* 105 U.S.P.Q. 499 (Comm. of Pat. 1955), *aff'd,* 242 F.2d 776, 44 CCPA 861 (1957), which indicated that incontestability has a defensive, not an offensive, effect and that when a mark becomes

incontestable, the owner's rights in the mark are not broadened. We note that in *Morrell* the court did not declare the plaintiff's mark invalid.

The language cited was clearly dicta in *Rand McNally.* In issue in the case was whether the mark, "Christmas Club" was descriptive when used as the title of defendant's magazine. Plaintiff indicated that he brought the petition to cancel the registration so that it could not become incontestable and prevent him from using the same words in connection with a savings plan as he had been doing. The assistant commissioner who wrote the patent office opinion indicated, in the language cited by the *Morrell* panel, that the plaintiff's fears were unfounded. By the defensive/offensive language he apparently was attempting to state in another way that incontestability would not enable the defendant to extend his mark more broadly than he could prior to incontestability. The assistant commissioner went on to hold that the mark as used was valid. The Court of Customs and Patent Appeals affirmed without reference to the dicta regarding incontestability.

The defensive/offensive language cited in *Morrell* has caused much confusion regarding the effect of incontestability. In *Tillamook County Creamery Association v. Tillamook Cheese and Dairy Association,* 345 F.2d 158 (9th Cir. 1965), *cert. denied,* 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed.2d 157, an infringement action, the court introduced a discussion of incontestability with the statement: "Without basing any special argument thereon or seeming to attach significance to it, the appellant suggests that . . . it had obtained incontestability of that registration." (Footnote omitted.) *Id.* at 163. It then held that the appellant properly refrained from arguing incontestability because of the defensive/offensive distinction. Citing *Morrell* it further stated:

"If plaintiff has attained incontestability of its mark, its registration could not be cancelled by a proceeding to cancel the same. But this does not aid the plaintiff

in any claim that it has an exclusive right to the name or mark or that it may rely on the same as a basis for an injunction against the defendant." *Id.*

Regardless of the reason plaintiff did not argue incontestability, it appears on the facts found by the court that plaintiff's mark was not incontestable with respect to the defendant. The court found that the defendant's predecessor had acquired the right to use the mark in question prior to plaintiff's use and that it had not been abandoned. Section 1065 provides that a mark does not become incontestable "to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark." 15 U.S.C. § 1065.[6] Thus, plaintiff had no right to rely on incontestability. Also, the court noted that the geographic location defense might be available to the defendant.

A second problem arises from the court's statement in *Tillamook* regarding incontestability preventing cancellation of plaintiff's registration. This problem is presented in clearer focus in the recent Eighth Circuit decision of *Wrist-Rocket Manufacturing Co., Inc. v. Saunders Archery Co.,* 516 F.2d 846 (8th Cir. 1975), *cert. denied,* 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100. The lower court in *Wrist-Rocket* held that plaintiff's action for trademark infringement, which was based on an incontestable mark, had not been sustained by the evidence; that the defendant was the common law owner of the mark because he had first used it prior to plaintiff's registration; and that plaintiff's registration should be cancelled and he be permanently enjoined from using the mark.

The Eighth Circuit first held incontestability was "not a sword" on which plaintiff

could rely to establish his exclusive right to use the mark citing, *inter alia, Tillamook.* It upheld the district court in its finding that defendant had a common law right to use the trademark, but held that the right was not exclusive.

The court then considered the district court's order cancelling plaintiff's mark and injunction against its future use. It held these actions were improper. The district court had held that plaintiff's mark was unprotected because a mark cannot become incontestable against a user's prior rights established under state law. This exception to § 1065 was quoted, *supra,* in discussing *Tillamook.* The Eighth Circuit held the district court's application of this section was improper because "[i]ncontestability is . . . a shield that protects the registrant from cancellation of his trademark by a prior user claiming superior rights." 516 F.2d at 851. At first glance this statement appears in conflict with the exception in § 1065. The language is perhaps unfortunate. As authority for this statement the court relied, *inter alia,* on *Tillamook, Morrell,* and 4 Callman, *Unfair Competition, Trademarks and Monopolies,* § 97.3(c)(1) (3d ed. 1970) at 599. Callman discusses incontestability of registration and incontestability of use. Section 1065 is entitled "Incontestability of right to use mark under certain conditions." Compliance with § 1065 entitles a registration to conclusive evidentiary weight under § 1115(b). Portions of § 1064 indicate that after five years a registration may only be cancelled for specified reasons. Callman refers to these portions of § 1064 as the "incontestability of registration" provisions. The statute does not use this terminology. Section 1064, not incontestability under § 1065, "protects the registrant from cancellation of his trademark by a prior user claiming superior rights" because prior use is not a ground for cancellation under § 1064. Section 1064's

---

6. This exception involving prior use must be contrasted with §§ 1115(b)(5) and 1115(b)(6). The first involves a situation where the registrant begins to use a mark (without registering it), the alleged infringer begins use of his mark without knowledge of the registrant's prior use, and then the registrant registers and publishes his mark. The second involves a situation where the alleged infringing mark was registered and used prior to the charging party's registration.

protection is broader than the incontestability rights under § 1065. Also, five years of use after registration entitles a registrant to protection under § 1064 whereas an affidavit must be filed to achieve incontestability under § 1065. References to the protection accorded registrations under § 1064 by the term "incontestability" causes confusion and should be avoided even though the sections were enacted at the same time and complement each other.

Other cases which have drawn the defensive/offensive distinction are: *Schwinn Bicycle Company v. Murray Ohio Manufacturing Co.*, 339 F.Supp. 973 (M.D. Tenn.1971) (relying on *Tillamook* and *Morrell*), *aff'd per curiam on other grounds*, 470 F.2d 975 (6th Cir. 1972); *Haviland & Co. v. Johann Haviland China Corporation*, 269 F.Supp. 928 (S.D.N.Y.1967) (relying on *Tillamook* and *Morrell*); *Electrical Information Publications v. C–M Periodicals, Inc.*, 163 U.S.P.Q. 624 (N.D.Ill.1969).

Defendants also rely on several cases which they assert stand for the general proposition that descriptiveness of a plaintiff's mark may be raised as a defense in any infringement action. There is no indication in *G. Lablanc Corporation v. H. & A. Selmer Inc.*, 310 F.2d 449 (7th Cir. 1962), *cert. denied*, 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963), that the mark involved was incontestable, notwithstanding defendants' indication to the contrary, or that this court considered that issue. In *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861 (S.D.N.Y.1962), *aff'd* 312 F.2d 125 (2d Cir. 1963), the district court mentioned incontestability, discussed the descriptive nature of plaintiff's mark, then assumed the mark's validity and held there was no infringement because defendant was using the word "Joy," plaintiff's mark, in a descriptive sense. Though the court did not

cite § 1115(b)(4), we note that under it defendant's use of the alleged infringing term in a descriptive sense is a defense to incontestability. The Second Circuit specifically declined to review the propriety of other findings of the district court; noted that since plaintiff's mark was incontestable, the primary issue between the parties was whether the defendant's use was likely to deceive or cause confusion or mistake; and held that the district court was not clearly erroneous in finding there was no likelihood of confusion. Thus, *Patou* is of little help to defendants; indeed, if it is relevant at all, the Second Circuit opinion lends support to plaintiff's position. Finally, we must consider *Flavor Corporation of America v. Kemin Industries, Inc.*, 493 F.2d 275 (8th Cir. 1974).

In *Flavor Corporation* the Eighth Circuit interpreted the incontestability provisions in relation to descriptiveness in an apparently unique manner. The court first declined to resolve the controversy over the precise effect of incontestable status. It held that a mark registered under § 1052(f) [7] could not become incontestable because of § 1065(4). Section 1065(4) provides: "[N]o incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise." Section 1052(f) permits the registration of marks which might be characterized as "merely descriptive" if the mark has become "distinctive of the applicant's goods in commerce." 15 U.S.C. §§ 1052(e), 1052(f). If a mark is the common descriptive name of an item, it does not qualify for registration under § 1052(f). If a mark becomes the common descriptive name of an item, it may be cancelled at any time and incontestability would be of no effect even if subsection (4) had not been enacted. 15 U.S.C. §§ 1064(c), 1065. Subsection (4) was added

---

**7.** Carbide's mark was not originally registered under § 1052(f), but secondary meaning has become an issue in this law suit. Section 1052(f) reads as follows:

"(f) Except as expressly excluded in paragraphs (a)–(d) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration."

to the act by the conference committee without explanation, and it is doubtful whether the provision does more than clarify what is already in the act. D. Robert, *The New Trade-Mark Manual* 138 (1947). In effect the Eighth Circuit has equated a mark that is descriptive, but distinctive of registrant's goods, with one that is the common descriptive name of an item. We do not believe this was the intention of Congress and decline to follow *Flavor Corporation* on this point. We note that this aspect of the case has received substantial criticism from commentators. W. Derenberg, *The Twenty-Seventh Year of Administration of the Lanham Trademark Act of 1946*, 64 *Trade-Mark Rep.* 339, 419 (1974); A. Fletcher, *The Pestlur Case—Collateral Estoppel Effect of CCPA and TTAB Decisions—Actual Confusion as to Incontestability of Descriptive Marks*, 64 *Trade-Mark Rep.* 252, 257 (1974).

Trademark statutes prior to the Lanham Act treated the substantive law of trademarks as primarily a state law matter. In enacting the Lanham Act Congress intended to unify trademark law on a national basis. The Senate Committee Report on the Act stated:

> "There can be no doubt under the recent decisions of the Supreme Court of the constitutionality of a national act giving substantive as distinguished from merely procedural rights in trade-marks in commerce over which Congress has plenary power . . . a sound public policy requires that trade-marks should receive nationally the greatest protection that can be given." Sen.Rep.No.1333, 79th Cong., 2d Sess. (1946), U.S.Code Cong.Serv.1946, p. 1277, reprinted in Robert, *supra* at 265, 269 (1947).

Callman indicates that the incontestability clauses are one of the most significant innovations in the Lanham Act and that they had a "vital effect upon the substantive law of trademarks." 4 Callman, *supra* § 93.-3(c)(1) at 598–99 (3d ed. 1970). In evaluating the incontestability clauses analytically, Callman states:

> "It would seem self-evident that there is no distinction between an incontestable, exclusive right and a property right, so that, in effect the Lanham Act implicitly demonstrates Congressional willingness to recognize the trademark as a property right. The exceptions to which this clause is subjected do not detract from this highly salutary result. They are nothing more than the usual limitations imposed upon every property right—the existence of its material foundation and the legality of its use." (Footnotes omitted.) *Id.* at 601.

Although Callman indicates that incontestability may lead to misuse "unless the incontestability privilege is counterbalanced or neutralized by judicial efforts to restrict the scope of protection accorded to marks that consist primarily of descriptive or otherwise defective matter," *id.*, and although he states the defensive/offensive rule, citing the *Morrell* line of cases, *id.* at 599, he also states: "When the right to use has become incontestable, the right to sue others for infringement is then fortified by a certificate of registration which is, under section 33(b) [15 U.S.C. § 1115(b)], conclusive evidence of the registrant's exclusive right to use the mark." (Footnotes omitted.) *Id.* § 97.3(c)(3) at 605.

The most recent expression of this court on the effect of incontestability appears in *Burger King of Florida, Inc. v. Hoots*, 403 F.2d 904 (7th Cir. 1968). The case involved cross suits for infringement for use of the name Burger King. Plaintiff's mark was incontestable. This court held that the incontestability of plaintiff's mark established conclusively plaintiff's exclusive right to use the mark. The defendant was allowed to continue to use the mark in a narrow geographic area because of its prior use in that area, a defense to incontestability under the statute. The panel was clearly aware of *Morrell* because it cited it on another point, and we note that, notwithstanding the defensive/offensive language in *Morrell*, not every court has viewed the case as holding that a plaintiff may not rely on incontestability in an infringement action.

In *Jockey International, Inc. v. Burkard*, 185 U.S.P.Q. 201 (S.D.Calif.1975), the court held that the defendants in the suit for infringement could not raise any defense or defect not enumerated in § 1115(b) because plaintiff's mark had become incontestable. The court cited, *inter alia, Morrell* in support of this proposition. The Fifth Circuit clearly allows the use of incontestability in infringement actions. In *John R. Thompson Co. v. Holloway*, 366 F.2d 108 (5th Cir. 1966), the court stated that although plaintiff's mark should have been refused registration if primarily a surname, this could not be raised as a defense because it was not one of the defenses enumerated under § 1115(b). Although *Rand McNally & Co. v. Christmas Club, supra,* is the apparent source of the defensive/offensive distinction, today the patent office appeals board apparently does not follow it. In *Seiler's Inc. v. Hickory Valley Farm Inc.*, 139 U.S. P.Q. 460 (T.T.A.B.1963), it sustained an opposition brought by the holder of an incontestable mark on the grounds that its incontestable registration was conclusive of its exclusive right to use the mark.

■ In light of this authority, we hold that a plaintiff in an infringement action establishes conclusively, under § 1115(b), his exclusive right to use a trademark to the extent he shows his trademark has become incontestable under § 1065. Incontestability does not broaden a trademark in the sense that it allows a registrant to claim rights over a greater range of products than he would otherwise be entitled to claim; but once incontestability is established, registrant's mark is immune from challenge on any grounds not enumerated in § 1115(b). There is no defensive/offensive distinction in the statute, and we do not believe one should be judicially engrafted on to it. To the extent that *Morrell* holds that a plaintiff may not use the conclusive evidence rule of § 1115(b) in an infringement action and to the extent such

a holding has not been overruled *sub silentio* by *Burger King*, we overrule it now. As stated earlier, it is not altogether clear that this is the holding of *Morrell*, but it has been so interpreted by other courts, including district courts within this circuit. J. McCarthy, *Trademarks and Unfair Competition*, § 11:17 (1973), summarizes the effect of incontestability in cases such as the present one:

"But if a mark has become 'incontestable' . . . then lack of distinctiveness of such a mark cannot be raised in litigation. That is, it is conclusively presumed either that the mark is non-descriptive, or if so, has acquired secondary meaning. Defendant faced with an incontestable registered mark cannot defend by claiming that the mark is invalid because it is descriptive."

■ The district court in this case failed to consider incontestability. Plainly it was improper for the court to declare plaintiff's mark invalid even though it did not order the registration cancelled. This would be true even if the defensive/offensive distinction were viable. Plaintiff has established incontestability under § 1065, and defendants in the present appeal have not shown that any of the first six defenses enumerated in § 1115(b) are available to them. These findings establish the validity of plaintiff's mark and would be sufficient for us to proceed immediately to consider the district court's conclusions regarding likelihood of confusion. However, even if we were to assume arguendo that the incontestability status of the plaintiff's mark did not preclude attack by the defendant on validity in the present litigation, we would reach the same result with regard to the mark involved. Because of what we view as serious misconceptions of the law of this circuit in the district court opinion, we deem it advisable to address the merits issue as an alternative ground supporting the validity of the EVEREADY marks.[8]

8. Because of this panel's treatment of prior cases in part I.B., this opinion has been circulated to all judges of this court in regular active service; and no judge has voted to rehear this case *en banc*.

Judge Philip W. Tone has disqualified himself from any consideration of this case.

## C. *Merits of Carbide's Trademark*

### 1. Descriptiveness

In discussing the validity of the EVER-EADY mark, the district court noted that the registration of a mark is " 'prima facie evidence' of (1) the validity of the registration, (2) the registrant's ownership of the mark and (3) the registrant's exclusive right to use the mark in commerce under the specified conditions and limitations of the registration." 392 F.Supp. at 285. Section 1115(a), regarding remedies such as actions for infringement, provides that a registration is admissible into evidence to establish registrant's rights on a prima facie basis but that an opposing party may prove any legal or equitable defense or defect which might have been asserted if the mark had not been registered. This is in contrast to a mark which has attained incontestable status, discussed *supra.*

 A mark which is "merely descriptive" may not be registered, and a holding that Carbide's mark was merely descriptive would defeat its action for infringement. 15 U.S.C. § 1052. Nevertheless, since the patent office allowed the EVEREADY mark to be registered and proof of distinctiveness under § 1052(f) was not required, it must have concluded that the mark was not "merely descriptive." This essential premise must be considered prima facie correct by a court in considering the validity of a trademark, or the prima facie evidence rule would be rendered ineffective. It is unclear whether the district court accorded any weight to the patent office's conclusion that the EVEREADY mark was not descriptive.

Defendants rely on a statement in *John Morrell & Co. v. Reliable Packing Co.,* supra: "[W]here descriptive words are used in the trademark, the assumption of validity can be easily overcome." 295 F.2d at 316. This statement was made in describing the holding in *Wilhartz v. Turco Products, Inc.,* 164 F.2d 731 (7th Cir. 1947). In *Wilhartz* this court held that under the circumstances of that particular case, the presumption of validity was easily overcome. The circumstances were that the mark, "Auto Shampoo," had been refused registration twice and then registration was finally allowed after the representations that "Auto" suggested instantaneous action while "Shampoo" as used suggested foaming, bubbling action as a result of the application by a spray mechanism. The court found these representations were a hoax in light of testimony by the vice-president of the company that he had never heard of such claims until the trial and that the product could be used just as effectively without the spray mechanism. The statement in *Morrell* is not inaccurate, but it is perhaps unfortunate because it has caused some to overlook the necessity of according prima facie weight to the patent office's conclusion that particular words as applied to a particular product are not descriptive.

The district court concluded that "Carbide's mark EVEREADY is descriptive and within the purview of § 2(e) of the Lanham Act. 15 U.S.C. § 1052(e)." 392 F.Supp. at 288. In light of the statutory reference we shall treat this finding as being that the mark is *merely* descriptive. *But see Ex Parte Heatube Corporation,* 109 U.S.P.Q. 423, 424 (Comm. of Pat. 1956).

 A mark is invalid if it is merely descriptive of the ingredients, qualities, or characteristics of an article of trade. *Warner & Co. v. Lilly & Co.,* 265 U.S. 526, 528, 44 S.Ct. 615, 68 L.Ed. 1161 (1924). Suggestive marks, however, have long been distinguished from descriptive ones. *Watkins Products, Inc. v. Sunway Fruit Products, Inc.,* 311 F.2d 496 (7th Cir. 1962), *cert. denied,* 373 U.S. 904, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); *Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc.,* 205 F.2d 921 (7th Cir. 1953), *cert. denied,* 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391; Restatement of the Law of Torts § 721 Comment (a) (1938). They may be thought of as a middle ground between arbitrary or fanciful names and descriptive names. *E. g. General Shoe Corporation v. Rosen,* 111

F.2d 95, 98 (4th Cir. 1940). The line between descriptive and suggestive marks is scarcely "pikestaff plain." Various tests have been used by courts to make the distinction. The district court, citing *General Shoe Corporation v. Rosen, supra*; *W. G. Reardon Laboratories, Inc. v. B & B Exterminators*, 71 F.2d 515 (4th Cir. 1934); and *Stewart Paint Manufacturing Co. v. United Hardware Distributing Co.*, 253 F.2d 568 (8th Cir. 1958), stated:

> "Suggestive terms 'suggest', but do not describe the qualities of a particular product. The distinction threatens to be one without a difference. Essentially, however, the common and ordinary meaning of the term to the public and the incongruous use of it as it relates to the product determine whether a term is suggestive." 392 F.Supp. at 286.

Another test which has been used and which was footnoted by the district court is whether competitors would be likely to need the terms used in the trademark in describing their products. See McCarthy, *supra*, § 11:21 at 391–92 (1973); Restatement of the Law of Torts § 721 Comment (a) (1938).

This court has not adopted a particular test for distinguishing between suggestive and descriptive marks. We disagree with the district court that it is a distinction without a difference, although it is often a difficult distinction to draw and is, undoubtedly, often made on an intuitive basis rather than as the result of a logical analysis susceptible of articulation. This only emphasizes the need to give due respect to the determinations of the patent office if the distinction is to be drawn in a consistent manner. Perhaps the best statement of the distinction appears in A. Seidel, S. Dalroff, and E. Gonda, *Trademark Law and Practice* § 4.06 at 77 (1963):

> "Generally speaking, if the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive."

The information imparted may concern a characteristic, quality, or ingredient of the product. We do not believe this conflicts with this court's holding in *Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc., supra*, even though some language in the opinion arguably indicates the contrary. Incongruity is not essential for a mark to be suggestive, rather than descriptive; but incongruity is a strong indication of non-descriptiveness, and it is probably the unusual case where a mark will be suggestive but not descriptive where there is no incongruity. The more imagination that is required to associate a mark with a product the less likely the words used will be needed by competitors to describe their products.

In analyzing Carbide's mark, the district court noted the dictionary definitions of "ever" and "ready" and concluded: "Thus, the combination of 'ever' and 'ready' means constantly prepared or available for service." Dissecting marks often leads to error. Words which could not individually become a trademark may become one when taken together. *E. g., Application of Standard Elektrik*, 371 F.2d 870, 54 CCPA 1043 (1967); *Food Fair Stores, Inc. v. Food Fair, Inc.*, 177 F.2d 177 (1st Cir. 1949).

Were we considering de novo whether EVEREADY was descriptive, we might reach a different conclusion than the district court, but it is our opinion that the issue is close. In *Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc., supra*, this court indicated it considered "Holeproof" as applied to stockings suggestive. The statement was made with reference to *Holeproof Hosiery Co. v. Wallach Bros.*, 172 F. 859 (2d Cir. 1909), although the court in that case did not pause to consider whether the mark was descriptive or suggestive but held that the mark had an established secondary meaning. The court in *Holeproof Hosiery* also discussed whether the mark was false and misleading. It held that no one would be misled because no one would be fatuous enough to believe the socks would never wear out. The mark EVEREADY is close-

ly analogous as applied to batteries. It suggests the quality of long life, but no one in our society would be deceived into thinking that this type of battery would never wear out or that its shelf life was infinite. There is less incongruity with regard to flashlight bodies. Nevertheless, we need not decide whether the mark's reference is too direct for the mark to be considered nondescriptive or whether the district court's holding to that effect should be overruled because of what we consider overwhelming evidence in the record of secondary meaning.

## 2. Secondary Meaning

■ Secondary meaning need only be shown if a mark sought to be registered or sustained is found to be or is conceded to be descriptive. *Watkins Products, Inc. v. Sunway Fruit Products, Inc., supra.*

For purposes of this section we will assume arguendo the correctness of the finding of the district court that Carbide's mark is descriptive.

■ The history and policy behind the secondary meaning doctrine was well stated in *G & C Merriam Co. v. Saalfield,* 198 F. 369 (6th Cir. 1912), *cert. denied,* 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947 (1917):

"It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, 'secondary meaning,' seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning." *Id.* at 373.

To establish secondary meaning it is not necessary for the public to be aware of the name of the manufacturer from which a product emanates. It is sufficient if the public is aware that the product comes from a single, though anonymous, source. *Spangler Candy Co. v. Crystal Pure Candy Co.,* 353 F.2d 641, 647 (7th Cir. 1965). It is easier to establish secondary meaning where the term used, while descriptive, is not generic. *W. E. Bassett Company v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir. 1970). *Cf. American Aloe Corporation v. Aloe Creme Laboratories, Inc.,* 420 F.2d 1248 (7th Cir. 1970), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91; *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845 (5th Cir. 1970), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90.

■ We agree with the district court's summary of the factors relevant on the issue of secondary meaning: "The amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony and consumer surveys." The district court also summarized the evidence in this case relating these factors to Carbide:

"The evidence shows that Carbide and its predecessors have distributed and sold electrical products under the EVER-EADY mark since 1909; that in 1915 10 million dry cell batteries marked EVER-EADY alone were sold with an advertising cost of approximately $225,000; that Carbide's sales of electrical products under the EVEREADY mark from 1963 to 1973 exceeded $100,000,000 each year; that during the 1963–1973 period Carbide advertised in magazines and trade journals, on radio and television and through point of sale displays and that the cost of the 1963–67 advertising was $50,000,000." 392 F.Supp. at 288.

Advertising expenditures, of course, are a measure of the input by which a company attempts to establish a secondary meaning. In issue is the success of this effort. The chief inquiry is directed toward purchasers' attitudes toward a mark. *Carter-Wallace Inc. v. Procter & Gamble Co.,* 434 F.2d 794,

802 (9th Cir. 1970). The public's attitude is more directly indicated by remarks of counsel for Ever-Ready. In his opening statement he said, "All right. We don't sell batteries, and that's what everybody thinks of when you mention the name EVER-EADY." Later during the trial he made a similar remark.

 Two surveys were taken in anticipation of this litigation. The district court discounted them on the issue of secondary meaning stating:

"Carbide introduced two surveys in evidence on the issue of likelihood of confusion. The surveys, however, do not help on the secondary meaning issue. There is no apparent evaluation of the products which would form a basis for the acquisition of secondary meaning. Indeed, there is no showing that the interviewee had past experience with Carbide's products so as to establish brand awareness." (Footnote omitted.) 392 F.Supp. at 289.

We know of no doctrine which limits use of such evidence to the issue on which it was originally introduced. It was perhaps only initially introduced on the issue of likelihood of confusion due to uncertainty as to whether the validity of Carbide's mark was in issue, see part I.A., and confusion over whether incontestability prevented Ever-Ready from raising descriptiveness as a defense. We have held that this defense should not have been considered in part I.B. In each of the surveys an insignificant number of persons named Carbide as the maker of defendants' products, but in excess of 50% of those interviewed associated Carbide products, such as batteries and flashlights, with defendants' mark. The only conclusion that can be drawn from these results is that an extremely significant portion of the population associates Carbide's products with a single anonymous source. The survey questions were not designed to establish secondary meaning; but once the issue of descriptiveness was improperly considered, the survey results could not be ignored.[9]

Additionally, we find it difficult to believe that anyone living in our society, which has daily familiarity with hundreds of battery-operated products, can be other than thoroughly acquainted with the EVEREADY mark. While perhaps not many know that Carbide is the manufacturer of EVEREADY products, few would have any doubt that the term was being utilized other than to indicate the single, though anonymous, source. A court should not play the ostrich with regard to such general public knowledge.

We hold that the district court's determination that there was inadequate evidence to find that EVEREADY had acquired a secondary meaning is clearly erroneous.

### D. Summary

Once Carbide's mark was established as incontestable, the district court should not have considered descriptiveness as a defense to plaintiff's suit. The only grounds upon which the validity of the mark could have been challenged were those enumerated in § 1115(b). Regardless of incontestability, plaintiff clearly established the validity of its mark on the basis of secondary meaning even if we were to accept the district court's conclusion that the mark is descriptive.

### II. Likelihood of Confusion

Section 1114, in relevant part, provides that any person who uses a mark in commerce which is likely to cause confusion with a registered mark shall be subject to the various remedies provided in the statute. A key issue in this case is whether it is likely that the public will be confused into believing that the products upon which the defendants' mark, Ever-Ready, appears emanate from the same source as products upon which plaintiff's mark, EVEREADY, appears.

 In determining whether likelihood of confusion exists, courts consider such factors as the type of trademark in issue, the similarity of design, similarity of products, identity of retail outlets and pur-

---

**9.** For a detailed discussion of the weight to be given the surveys, see part II, *infra*.

chasers, identity of advertising media utilized, defendant's intent, and actual confusion. *Roto-Rooter Corporation v. O'Neal*, 513 F.2d 44, 45–46 (5th Cir. 1975). Survey evidence is often used because it is easier to obtain than evidence of actual confusion. Products need not be in direct competition for infringement to exist. *E. g., Continental Motors Corporation v. Continental Aviation Corporation*, 375 F.2d 857, 861 (5th Cir. 1967). Of course, the more closely products are related the more likely sources may be confused. Nevertheless, the directness of competition is only one factor to be considered in determining likelihood of confusion. *Id.* A distinctive mark or name will be more broadly protected than words, such as "ever ready," which have been registered and applied to a variety of products. *Philco Corporation v. F. & B. Manufacturing Co.*, 170 F.2d 958, 961 (7th Cir. 1948), *cert. denied*, 336 U.S. 945, 69 S.Ct. 813, 93 L.Ed. 1102 (1949).

The district court found that the parties' marks were dissimilar. The conclusion was based "on the whole appearance" of the marks, and we would agree that when the marks are placed side-by-side differences are readily apparent.[10] However, as the district court noted at an earlier point in its opinion, a side-by-side comparison of the marks is not the proper test. The test is the consumers' state of mind when faced with the marks individually. *G. D. Searle & Co. v. Chas. Pfizer & Co., Inc.*, 265 F.2d 385, 388 (7th Cir. 1959), *cert. denied*, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65; *Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc., supra*, 205 F.2d at 924. Courts have often held that small changes in words, such as adding or deleting a hyphen, are insufficient to distinguish marks. *E. g., Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479 (S.D.N.Y.1968). Indeed, the terms "EVEREADY" and "EVER-

READY" have been held to be "in legal contemplation identical." *Union Carbide Corporation v. Midwest Mower Corporation*, 132 U.S.P.Q. 689 (T.T.A.B.1962). In *Independent Nail* the district court distinguished the parties' marks stating that the marks had no resemblance to each other beyond the use of the word "Stronghold." This court reversed stating: "The court apparently gave no weight to the fact that 'Stronghold' is the most prominent word in defendant's mark while 'Stronghold Nails' are the most prominent words appearing in plaintiff's mark." 205 F.2d at 924. Consumers often do not retain a clear impression of the precise form in which a mark appears. This is not from carelessness but rather is due to the fallibility of the human memory. In *Spangler Candy v. Crystal Pure Candy Co., supra*, we indicated:

> "It is sufficient if one adopts a trade name or a trade mark so like another in form, spelling, or sound that one, with a not very definite or clear recollection as to the real trade-mark, is likely to become confused or misled." 353 F.2d at 644.

*See also Stix Products Inc. v. United Merchants & Manufacturers Inc., supra.* We find no evidence of bad faith on the part of Ever-Ready, but the latecomer has a responsibility to avoid confusion.

Cases such as *Quaker Oats Co. v. General Mills, Inc.*, 134 F.2d 429 (7th Cir. 1943), and *Southern Shell Fish Co., Inc. v. S. Felicione & Sons Fish Co., Inc.*, 108 U.S.P.Q. 289 (Comm. of Pat. 1956), do not conflict with the principles stated above. In *Quaker Oats*, this court held that the mark "Oaties" did not infringe General Mills marks, Wheaties, Kornies, and Maizies, in the light of substantially different package designs, a clear statement appearing on the box that the cereal was manufactured by Quaker Oats Co., and the name Quaker appearing at 20 places on the box. Quaker produced

---

10. The district court noted these differences: "The EVEREADY mark as used has all letters capitalized. 'Ever-Ready' as used only as the 'E' and 'R' capitalized. Ever-Ready's mark consists of two words. The marks are spelled differently. The EVEREADY mark appears in ascending and descending block letters and appears generally on a blue or red background, which is pentagonal or hexagonal in shape. 'Ever-Ready' is written in descending script on a black trapezoidal background." 392 F.Supp. at 291 n. 19.

over 100 witnesses who testified they were not confused in contrast to a survey of 17 persons taken by General Mills which indicated they thought the cereal was made by the Wheaties Company. The court held that the test was whether Quaker had taken reasonable precautions to prevent confusion, and the court held that it had. We note that the words used in the marks in *Quaker Oats*, Wheaties and Oaties, were much less similar than EVEREADY and Ever-Ready. Also, there was a very close relationship between the mark Oaties and the product on which it appeared, a cereal made from oats.

In *Southern Shell Fish*, the assistant commissioner held in view of the fact that the Gulf area was important in connection with the packing of sea food and since the products in competition are normally sold on a self-service basis, and further in light of the visual differences of the packages, the similarity in sound of the marks, Gulf Taste and Gulf Kist was not sufficient to cause likelihood of confusion. It would appear that buyers would be much more likely to associate the product with the geographical area of the Gulf than with a particular company. That situation does not exist in the present case. Also, we note that once again the words used in the marks are not as similar as those involved in the present case.

This court has held that likelihood of confusion is a question of fact subject to the clearly erroneous rule. *Watkins Products, Inc. v. Sunway Fruits Products, Inc., supra*, 311 F.2d at 499. Nevertheless, to the extent the determination is predicated upon the similarity of the marks themselves, it is a mixed question of law and fact with this court being in as good a position as the trial judge to determine the probability of confusion. *Harold F. Ritchie v. Chesebrough-Pond's, Inc.*, 281 F.2d 755 (2d Cir. 1960). *See J. B. Williams Company, Inc. v. LeConte Cosmetics, Inc.*, 523 F.2d 187 (9th Cir. 1975). We hold that the trial court erred in holding that the marks of the plaintiff and defendant were dissimilar in the contemplation of the law. The court did not err in considering the mark as a whole but failed to give sufficient weight to the predominant feature of the marks, the words "ever ready."

The district court rejected all the evidence of actual confusion presented by Carbide as not being entitled to weight. Since the test under § 1114 is likelihood of confusion, courts have often held that it is unnecessary to show actual confusion. *E. g., Watkins Products, Inc. v. Sunway Fruit Products, Inc., supra; Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc., supra*. Nevertheless, courts often view evidence of actual confusion as the best evidence of likelihood of confusion, though isolated instances of actual confusion or misdirected mail have been held insufficient to sustain a finding of likelihood of confusion. *Compare, e. g., Spangler Candy Co. v. Crystal Pure Candy Co., supra,* 353 F.2d at 644; *Roto-Rooter Corporation v. O'Neal, supra*, 513 F.2d at 45–46 *with Sunbeam Lighting Co. v. Sunbeam Corporation*, 183 F.2d 969, 974 (9th Cir. 1950), *cert. denied*, 340 U.S. 920, 71 S.Ct. 357, 95 L.Ed. 665 (1951); *Everest & Jennings, Inc. v. E & J Manufacturing Co.*, 263 F.2d 254, 260 (9th Cir. 1958), *cert. denied*, 360 U.S. 902, 79 S.Ct. 1284, 3 L.Ed.2d 1254 (1959). The value of evidence of actual confusion is greater when the products involved are low value items because purchasers are unlikely to complain when dissatisfied, which would bring to light confusion; but rather they are likely simply to avoid all products produced by the company which they believe produced the product which caused them trouble.

Carbide presented three instances of actual confusion to the trial court. The first was a letter of complaint concerning a bulb which was initially sent to "Ever-Ready, Inc.; Chicago, Illinois 60607," the address which appears on Ever-Ready's miniature bulb blister packs. The letter was returned for insufficient address. She then mailed the letter to Carbide in New York. Concerning this evidence the district court stated:

"This incident does not prove that Mrs. Kaplan was confused. Initially she knew from whom she purchased the defective product since she addressed the letter to Ever-Ready in Chicago. Indeed, she gave the exact address which appears on Ever-Ready's miniature bulb blister packs. At the least, this incident shows that Mrs. Kaplan did not identify Carbide as the source of the product." (Footnote omitted.) 392 F.Supp. at 290.

We disagree, finding a more reasonable inference is that she first obtained the address from the blister pack and then when the letter was returned as having an insufficient address she found a more complete address from some other source for what she thought was the one company using the combination of the words "ever" and "ready" for bulbs, batteries, and similar products. She need not have known Carbide by name for confusion to have been demonstrated. Finally, in the absence of knowledge by the consuming public of the defendant as a marketing entity, it is clear that her reference in her letter to "your fine reputation" did not refer to anyone other than Carbide.

■ The second instance occurred when Carbide's then Chicago counsel sent his secretary, Mrs. Bailis, to purchase EVER-EADY high-intensity miniature lamp bulbs. In this court it is disputed whether he knew Carbide did not sell bulbs so denominated; but the district court held that he did, and this finding is not clearly erroneous. Mrs. Bailis went to Marshall Field & Co., and the sales clerk showed her Ever-Ready bulbs and assured her that the bulbs were made by Carbide. Regarding this evidence the district court stated:

"The sales clerk's confusion is not entitled to any weight. Obviously the desire to make a sale influenced her actions. At least, it is impossible to distinguish between her alleged confusion and her desire to make a sale. Moreover, evidence of this type, manufactured by a party after a complaint has been filed, is suspect." 392 F.Supp. at 291.

This court upheld the district court's finding of no likelihood of confusion in the face of a similar attempt to manufacture evidence in *Philco Corporation v. F. & B. Manufacturing Co., supra*, 170 F.2d at 961, though the evidence in that case was less clear because the court believed that the sales clerk recognized the purchaser's mistake and substituted the product which the purchaser was apparently seeking whereas in this case the sales clerk made a specific representation that the goods were manufactured by Carbide. If the court meant to indicate that confusion by sales clerks is never probative, we disagree. Although we have great difficulty conceiving that a clerk's anxiety to make this small-dollar sale would prompt a deliberate and knowledgeable misrepresentation, if we assume that the clerk was not confused, the evidence is nevertheless relevant because it is unfair competition for a person to put a product into a dealer's hands which a producer can reasonably anticipate may be easily passed off as the goods of another. *Stewart Paint Manufacturing Co. v. United Hardware Distributing Co., supra*, 253 F.2d at 575. *See Warner & Co. v. Lilly & Co., supra*. Assuming the clerk was confused, this gives rise to an inference that purchasers would also be confused because salespersons are more likely than customers to be familiar with various marks on the merchandise they sell and hence are less likely to be confused. *Jockey International, Inc. v. Burkard, supra*, 185 U.S.P.Q. at 205; *Stix Products, Inc. v. United Merchants & Manufacturers Inc., supra*, 295 F.Supp. at 495 n.56. *See Aloe Creme Laboratories, Inc. v. Milson, Inc., supra*, 423 F.2d at 850.

■ The third incident involved testimony by a Mrs. Lonczak and her daughter from New Jersey who wrote a letter to Carbide protesting the poor quality of an Ever-Ready bulb. The court attributed this to carelessness in examining the marks and ignoring the Chicago address appearing on the blister packet. Mrs. Lonczak initially called telephone information service to obtain Ever-Ready's address. She apparently viewed the address given on the blister packet as inadequate but did call Chicago

and asked for the address of the "EVER-EADY battery people." Upon finding there were several "Ever Readys" listed, she called the store where she had purchased the bulbs, explained the problem with the bulbs, and asked for an address to which to send a letter of complaint. She was given Carbide's address. The district court states that there is no evidence that Mrs. Lonczak correctly identified the product to the store so as to enable it to identify Ever-Ready as the product's source. Presumably this is a reference to the difficulty in aurally distinguishing EVEREADY from Ever-Ready, and Mrs. Lonczak testified that she told the store that she was the person who had been complaining about the "EVEREADY" bulbs so it is possible, if she was talking to someone unfamiliar with her complaints, that the sales person thought she was referring to flashlight bulbs. The district court states that at most this evidences the store's confusion. The district court also states that "Mrs. Lonczak did not examine the 'Ever-Ready' mark on the miniature bulbs until after she was contacted by Carbide's counsel." 392 F.Supp. at 291. The testimony shows that while Carbide's counsel was interviewing Mrs. Lonczak her husband got an EVEREADY battery from a flashlight, and they noticed the difference between the marks while comparing them.

We find the testimony of Mrs. Lonczak and her daughter probative of their confusion. We do not discredit the sales person's confusion because he was a sales person but rather because he was told of the product and the product is normally bought on a self-service basis—by sight. At least the district court's conclusion in this regard is not clearly erroneous. On the other hand, Mrs. Lonczak's testimony is clear that she thought the bulb was put out by the EVEREADY battery people when she purchased it, and her daughter's testimony is clear that she thought it was put out by the same company that put out batteries and flashlights from the time her mother gave her the bulbs. This is supported by her testimony that when she called information she asked for the address of the EVEREADY battery people. Her testimony cannot be discredited because she did not make an exacting examination of the Ever-Ready mark or did not compare it with a product of Carbide containing the EVEREADY mark. As we have indicated above, a side-by-side comparison is not the test of likelihood of confusion.

A district judge's determination of evidentiary matters is entitled to great respect. Though we disagree with the district judge on the above points, we would hesitate to find his determination that Carbide failed to establish likelihood of confusion was clearly erroneous were it not for the survey evidence presented at trial.

Two surveys were taken by an expert in the field of market research and public opinion surveys. One was taken to establish likelihood of confusion between Ever-Ready lamps and Carbide's products; one was taken to determine likelihood of confusion between Ever-Ready bulbs and Carbide's products. Relevant facts concerning the surveys follow:[11]

| Lamp Survey | Bulb Survey |
| --- | --- |
| **Questions** | |
| 2) Who do you think puts out the lamp shown here? | 2) Who do you think puts out these mini-bulbs? |
| 3) What makes you think so? | 3) What makes you think so? |
| 4) Please name any other products put out by the same concern which puts out the lamp shown here. | 4a) Have you seen or heard of any advertising by the concern which you think puts out these mini-bulbs? |
| | 4b) Please specify where, what type and features you recall. |
| | 5) Please name any other products put out by the same concern which you think puts out these mini-bulbs. |
| A picture of an Ever-Ready lamp was shown to each person being interviewed. | A blister pack of Ever-Ready bulbs was shown to each person being interviewed. |
| **Number Interviewed** | |
| 1009 | 1014 |

11. Question 1 in each survey was a screening question designed to eliminate persons involved in the bulb or lamp industries.

| Results: | Lamp Survey | Bulb Survey |
|---|---|---|
| Number who associated the product displayed with Union Carbide | | |
| a) by answering Union Carbide | 6 (.6%) | 13 (1.3%) |
| b) by indicating Carbide products, such as batteries, as being put out by the same concern | 551 (54.6%) | 545 (53.7%) |
| Subtotals | 557 (55.2%) | 558 (55.0%) |
| c) associated blister packet with Carbide's advertising | —— | 57 (5.6%) |
| Totals | 557 (55.2%) | 615 (60.6%) |

We note these percentages are substantially higher than those held sufficient in other cases to support in part an inference that confusion is likely. *Jockey International, Inc. v. Burkard, supra,* (11.4%); *Seven-Up Company v. Green Mill Beverage Co.,* 191 F.Supp. 32 (N.D.Ill.1961), (25%); *Humble Oil & Refining Co. v. American Oil Co.,* 259 F.Supp. 559 (E.D.Mo.1966), (18%); *Simoniz Co. v. Stumpmier,* 117 U.S.P.Q. 130 (E.D.Ill.1957), (18%, 24%).

Prior to trial the survey questions were presented to Judge Tone, then a district judge, along with memoranda and arguments. He ruled the survey results would be admissible at trial but reserved the question of the weight to be given the survey evidence. In light of the cost of taking a survey, this was a commendable procedure to follow where parties cannot agree on survey questions. However, we also observe that desirable procedure would be for the parties to attempt in good faith to agree upon the questions to be in such a survey.

The district court found the surveys were entitled "to little, if any, weight." It based this holding on *General Motors Corporation v. Cadillac Marine & Boat Co.,* 226 F.Supp. 716 (W.D.Mich.1964); the testimony of Thomas Fitzpatrick, plaintiff's expert; and certain statistical correlations.

In *Cadillac* the plaintiff introduced survey results which the court refused to credit. The purpose of the survey was to establish likelihood of confusion, and the questions were similar to those in the present case.[12] However, the mechanics of the Cadillac survey were sloppy. The sample was of only about 150 persons. Many had no knowledge of boats and were not "purchasers." The questioning was conducted by two college students, and the tabulations were held to be "neither accurate nor truly reflective." The court held the second question to be a "classic example of a leading question." *Id.* at 736. Why this characterization was justified is not clearly explained, but the court did state: "The question directed an opinion to those who had formed none on the first inquiry." *Id.*[13]

In other cases, very similar surveys have been held to be of probative value. In *Sperry Rand Corporation v. Seawol Distributors, Inc.,* 140 U.S.P.Q. 532 (S.D.Cal.1964), the court held a similar survey competent evidence which confirmed the independent judgment of that court. In *Standard Oil Co. v. Standard Oil Co.,* 141 F.Supp. 876 (D.Wy.1956), *aff'd,* 252 F.2d 65 (10th Cir. 1958), the district court relied in part upon a survey in which persons were asked what their reactions were to the word Sohio. In affirming, the appellate court approved the use of the survey by the district court.[14] 252 F.2d at 74–75. *See also Girl Scouts of*

---

12. "(1) Who do you think puts out the boats shown on the opposite page; and (2) Will you please name anything else that you think is put out by the same concern?" 226 F.Supp. at 734 n.16.

13. While scarcely illuminating on the efficacy of the survey utilized in *Cadillac,* there may be some aspects of *ratio decidendi* in the district court's observation: "General Motors should *not be permitted to reach out its strong, choking, monopolistic hand to strangulate industries or free enterprises located within the City of Cadillac, Michigan." *Id.* at 741.

14. The questions asked in *Standard Oil* are not reproduced in the published opinions but are part of the record on this appeal. The questions were:

"1. If you were to stop at a service station in Michigan, displaying the name SOHIO as shown here, what oil company would you think put out the gas and oil sold there?
"2. What is there about the name that suggests that particular oil company to you?
"3. Please name any well-known brands or trade names used by that oil company for its gas or oil."

*United States v. Hollingsworth*, 188 F.Supp. 707 (E.D.N.Y.1960).

On cross-examination Thomas Fitzpatrick, plaintiff's expert who prepared and supervised the surveys testified:

"Q Well, would you go so far as to say that the survey there conducted in the Cadillac case was not probative, or did not tend to show likelihood of confusion as to the source of origin of the Cadillac boats?

"A I would say that it was a leading questionnaire.

"Q And, therefore, slanted?

"A Yes.

"Q And, therefore, likely to lead to bias?

"A Possibly, yes.

"Q And, therefore, likely to lead to error?

"A Correct."

On re-direct examination he testified that the sample size in the Cadillac survey was inadequate but that the questions were not leading and that on direct examination, when he testified to the contrary, he thought he was being asked what the judge thought in the Cadillac case. The re-direct examination took place after a recess; defendant implies that Fitzpatrick may have changed his testimony as a result of a conference with Carbide's attorneys. The district court neither specifically credited nor discredited this testimony, but it ignored it.

■ The district court noted that approximately 600 of the interviewees in the bulb survey (59.1%) responded "ever ready" to Question 2 "because it says so on the pack." He also noted that of the 176 who indicated a specific source of the product in response to this question approximately 90% identified someone other than Carbide.[15] There is no dispute that the answers to these first questions do not, alone, establish confusion.

■ The district court attached significance to the statistics which show that in the bulb survey 179 interviewees responded initially, "I don't know" to Questions 2 and 3 but of these 48 responded batteries or flashlights to the final question. These 48 were counted as cases of confusion. Finally, the court found the advertising question in the bulb survey improper because Ever-Ready does not advertise its mini-bulbs while Carbide does substantial advertising. While there is uncontradicted evidence that Ever-Ready bulbs have been advertised at least to a limited extent by dealers, we cannot hold the district court clearly erroneous for treating this advertising as insignificant in light of the extreme disproportion between Ever-Ready's advertising and Carbide's.

■ We do, however, hold the district court clearly erroneous in not crediting the surveys taken by Carbide. That the first questions alone do not show likelihood of confusion is insignificant. They only show the interviewees do not associate the Ever-Ready name with Carbide. The test, as discussed *supra*, is whether they associate the products either with Carbide *or* with the single, though anonymous, source which manufactures EVEREADY products. Those who indicated that they believed other Carbide products were manufactured by the same company that produced the bulbs or lamps shown must be considered cases of confusion. The statistics regarding those who initially answered, "I don't know," though arguably consistent with the latter questions being leading, are also consistent with confusion resulting from an anonymous source. The questions on their face are not leading. Apparently the argument that they are leading is based on the likelihood that the first questions will provoke the response, "ever ready," and then the interviewee will be more likely to confuse the product because the marks are aurally identical while there are visual differences. This is not a case where the interviewer stated the similar parts of the plaintiff's

---

15. Defendants similarly argue: "635 properly stated that the product was put out by 'Ever-Ready because it says so.' 179 answered 'I don't know.' 140 named G.E. or some other firm. 23 positively identified defendant as 'Ever-Ready, Chicago.' Thus a total of 977 or 97% were not confused."

name several times in questions and then asked about the defendant company. *Cf. Sears, Roebuck & Co. v. All States Life Insurance Co.,* 246 F.2d 161 (5th Cir. 1957), *cert. denied,* 355 U.S. 894, 78 S.Ct. 268, 2 L.Ed.2d 192. The surveys in this case do not share many of the weaknesses of the one in *Cadillac.* There was clear testimony that the sample size was sufficient, and that is not disputed. The survey was taken by professionals, who were stipulated to be qualified experts. The survey was directed to the relevant universe. Almost anyone would be likely to have purchased bulbs, lamps, batteries or flashlights. Thus a survey of the general population was appropriate. The general population is not equally interested in boats. A survey is more helpful where low value items are involved, rather than high value items, because purchasers of high value items are likely to study the product they are purchasing more carefully than the purchaser of a low value item. We do not, of course, mean to indicate that a survey could not be probative where high value items are in issue, an issue not before this court. *See Grotrian v. Steinway & Sons,* 365 F.Supp. 707, 715–17 (S.D.N.Y.1973), *aff'd in relevant part,* 523 F.2d 1331, 1339–42 (2d Cir. 1975).

■ We cannot hold the district court's determination that the advertising question was improper was clearly erroneous in light of the finding that Ever-Ready's advertising was insignificant compared to Carbide's. Fitzpatrick eliminated the advertising question from the lamp survey upon learning that it was not advertised. Since the only advertising the question was likely to call to mind was Carbide's, the responses indicating Carbide's advertisements cannot be counted as cases of confusion. Whether the presence of the question biased the survey results is a separate question. Carbide argues that a comparison of the results of the lamp survey (55.2% confused), which did not contain an advertising question, with the results of the bulb survey without considering the 57 respondents who were considered confused because they associated the bulbs with Carbide's advertising (55.0% confused) shows that the results were not biased.

This argument carries some weight, but it is far from conclusive because it appears that those who associated both Carbide's advertising and Carbide's products with the bulbs were tabulated as cases of confusion by reason of having associated the products with the bulbs. Thus a person who might not have been confused if only asked about the products might have been reminded of EVEREADY advertising and then associated the advertising with other EVEREADY products. This weakens the probative value of the bulb survey. Nevertheless, we believe the likelihood of substantial bias as a result of the advertising question is small.

Taking into account all the above factors, we hold the district court clearly erroneous in finding no likelihood of confusion. The predominant feature of the marks are the words "ever ready." The visual differences are not so substantial that they are likely to overcome the effect of this similarity when the marks are not side-by-side. The lamp survey showed substantial likelihood of confusion. The percentage of the interviewees confused was far in excess of the percentages which have been held sufficient to establish likelihood of confusion. Though the bulb survey cannot be credited to the extent of the lamp survey, we believe likelihood of confusion regarding the bulbs was also shown. There was evidence of actual confusion regarding the bulbs. The design of the Ever-Ready mark appearing on the bulbs is similar to that appearing on the lamp so its results tend to show the bulbs would be confused also. We do not believe the bias in the bulb survey was likely to be sufficiently great so as to reduce to insignificance the extremely high percentage of confusion shown by the survey.

### III. Laches

■ Ever-Ready argued in the district court that even if it is infringing Carbide's mark, it should not be enjoined because Carbide is barred by laches. The essence of the argument was that Ever-Ready distributed products for Carbide about 1952 and therefore Carbide clearly knew of the company for many years. Prior to 1971, Ever-

Ready did not market the electrical products involved in this case under its own name. It still markets many products under other names, including such products as flashlights (Femlite; Lumi*jet*). In the trade Ever-Ready has used its own name in marketing these products, but there is no evidence that this resulted in confusion. In 1971, Ever-Ready began marketing the products involved in this case. Carbide filed its complaint on December 30, 1971. The time lapse is insufficient to establish laches on the facts of this case. In any event, the issue of laches was not urged on this appeal and may be considered as having been waived.

## IV. Antitrust Issues

As noted hereinbefore, the antitrust issues raised as an affirmative defense by the defendants were severed for separate trial pursuant to Fed.R.Civ.P. 42(b) and are not involved in this appeal.

In their amended answer, the primary thrust of the defendants' antitrust contentions is directed toward 15 U.S.C. § 1115(b)(7), which relates only to one of the seven specified defenses to incontestability of plaintiff's trademarks. In this opinion, we have alternatively determined validity of the trademarks irrespective of the Lanham Act which arguably would appear to preclude any further viability to the antitrust defense. However, a fair reading of the antitrust affirmative defense would indicate that it is sufficiently broad as to include a claim for equitable denial of enforcement of the trademarks on the basis of their claimed use in violation of the antitrust laws aside from the specific defense to incontestability. In *Stiftung v. V.E.B. Carl Zeiss, Jena,* 298 F.Supp. 1309, 1314 (S.D.N.Y.1969), *affd. on the point in issue,* 433 F.2d 686, 706 (2nd Cir. 1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971), Judge Mansfield, then of the district bench, reached the conclusion that although the issue was not free from doubt, "a court, in the exercise of its equity powers, may deny enforcement of a trademark on the part of one who has used that trademark in

violation of the antitrust laws." We agree but we also agree with Judge Mansfield's opinion that the burden of such proof is a heavy one on the proponent of the issue and that the forces favoring the defense are much weaker than in patent cases which involve by their very nature a monopoly situation. Nevertheless, in view of the posture of this case as it has reached us, we will not deny the defendants the opportunity to take up the burden of proof.

## V. Relief

The judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion. In the event of a failure by the defendants upon further proceedings to sustain their antitrust affirmative defenses, the district court will enter an appropriate injunction. In so doing, the court will have to determine whether Ever-Ready should be barred from using its name *in the trade* in connection with electrical products such as mini-bulbs and lamps. We also leave to the district court's discretion in the event the plaintiff ultimately prevails whether to grant the remedy of delivering up articles on which the mark appears sought by Carbide under § 1118. All further proceedings in this cause shall be reassigned to another judge pursuant to Circuit Rule 23.

Since all the relief plaintiff seeks may be granted under the federal act, we need not address plaintiff's state law unfair competition and dilution claims.

The judgment of this court will assess costs of this appeal against the defendants.

REVERSED AND REMANDED.