STANDARD PRESSED STEEL CO., a
corporation of Pennsylvania, Plaintiff,

v.

MIDWEST CHROME PROCESS
COMPANY, a corporation of
Michigan, Defendant.

No. 74 C 2781.

United States District Court,
N. D. Illinois, E. D.

July 29, 1976.

Martin R. Greenstein of Baker & McKenzie, Chicago, Ill., for plaintiff.

William A. Van Santen, Chicago, Ill., for defendant; Michael R. Dinnin, Jr., of Harness, Dickey & Pierce, Birmingham, Mich., of counsel.

## MEMORANDUM DECISION

MARSHALL, District Judge.

This is an action for *de novo* review of a decision of the Trademark Trial and Appeal Board holding in an opposition proceeding, *inter alia,* that there was no likelihood of confusion between the plaintiff's registered trademark and the mark the defendant wishes to register. *Standard Pressed Steel Co. v. Midwest Chrome Process Co.,* 183 U.S.P.Q. 758 (TT&AB 1974). The plaintiff's complaint also contains five additional counts, two of which arise under the Trademark Act, and the remainder under the laws of Illinois. The parties have filed cross-motions for summary judgment which are ready for decision.

The plaintiff, Standard Pressed Steel Co. (SPS), is a Pennsylvania corporation with its principal place of business located in Jenkinstown, Pennsylvania. For the past 50 years it been engaged in the development, manufacture, promotion, advertising, sale, and distribution in interstate commerce of fastening devices, screws, bolts, and related products identified by the trademark UNBRAKO. Complaint, ¶ 4.

It is the owner of three registrations on the principal register for the trademark UNBRAKO:

a) Registration No. 301,583—Dated March 7, 1933 twice renewed, for "hollow set screws, socket head cap screws, square head set screws, socket head shoulder screws, stripper bolts, and pipe plugs" in Class 13;

b) Registration No. 606,609—Dated May 31, 1955 for "button head screws" in Class 13;

c) Registration No. 978,910—Dated February 19, 1974 for "fasteners and pressure plugs" in Class 13 and "wrenches" in Class 23.

Complaint, ¶ 5, Ex. 1–3. The plaintiff alleges that the mark UNBRAKO has been conspicuously used for more than 50 years and has been applied to its products and used in its advertisements associated with the trademark. As a result of this continuous use, the plaintiff further alleges that the trademark UNBRAKO has become famous with users of fastening devices as a symbol of high quality and high utility, and thus a valuable asset and symbol of the plaintiff's good will.

Midwest Chrome Process Company is a Michigan corporation with its principal place of business in the same state. It applied for registration of the mark UNBAR as a trademark for corrosion resistant chrome plated fasteners and other types of metal fasteners and coated products. The application, which alleged a first use in interstate commerce of February 20, 1971, was filed on March 17, 1971.

SPS opposes registration of the UNBAR mark on the grounds that (1) registration will result in likelihood of confusion as to the source of origin of the goods, and (2) that Midwest has never used the term UNBAR as a trademark. The Trademark Trial and Appeal Board held that considering all the facts and circumstances, there was no likelihood of confusion between the two marks, and that the remaining issues were, therefore, *ex parte,* and would be remanded to the Examiner in accordance with Trademark Rule 2.131. 37 C.F.R. § 2.131 (1975).[1]

Before the issues raised by the cross motions for summary judgment can be resolved, an examination of the litigants' businesses as they relate to the use of the marks in question must be undertaken. Leonard H. Clark, the Marketing Manager of the UNBRAKO Division of SPS, stated in his deposition that the trademark UNBRAKO, which is a coined word, is applied to a complete line of screw products and fasteners used in the industrial and automotive market. Some of the Division's major customers are General Motors, Ford, Chrysler, and American Motors.

The UNBRAKO Division sells its products either directly to the ultimate user or through wholesale distributors. And the fasteners are sold both prepackaged and in bulk. Approximately 20 percent of the fasteners are coated with a chrome plating or some other rust preventive preparation. The coatings are applied either by SPS or an outside contractor. Frequently, when fasteners are sent to an outside contractor for coating, they are returned to UNBRAKO for repackaging after application of the coating and then shipped to the ultimate purchaser.

The UNBRAKO catalogue lists a number of coatings that can be applied to its fasteners. When a fastener receives a particular coating, that will be noted on the packaging. One of the plaintiff's coating jobbers, Wyco Chromium Co., is also a licensee for the defendant.

The UNBRAKO Division has annual sales of approximately $16,000,000.

---

1. In relevant part,

Rule 2.131 provides that, "If, in considering an inter partes case involving an application, facts appear which, in the opinion of the Trademark Trial and Appeal Board, render the mark of the applicant unregistrable on one or more ex parte grounds, the Board shall in its decision on the inter partes issues in the case recommend that if the applicant finally prevails in the case, registration be withheld pending a re-examination by the Examiner of Trademarks of the application in light of such facts."

In terms of advertising, it has spent on the average of $200,000 per year for the past five years. The advertising is directed at four specific groups: purchasing and design engineers, production management, general management, and distributors. It appears in such trade publications as *Machine Design, Design News,* and *Assembly Engineering,* and advises potential customers that UNBRAKO fasteners are available with a number of coatings or finishes.

Midwest, on the the other hand, is the owner of a patented proprietary process for electroplating small carbon steel parts including fasteners intended for exterior use in the automotive industry. The plating is a chrome coating which yields a highly corrosion resistant finish.

Midwest alleges that it first made use of the mark UNBAR in interstate commerce on February 20, 1971 when it shipped between fifty and two hundred fasteners from its plant in Detroit to its outside sales representative in Chicago, Illinois. The fasteners were purchased from an outside supplier and coated by the UNBAR process. The mark UNBAR was stamped on the accompanying papers and shipping carton, and the fasteners were used as samples of the defendant's product.

The first commercial sale of fasteners treated with the UNBAR process allegedly occurred in January of 1972. This transaction apparently is typical of the manner in which the defendant normally conducts its business. The manufacturer sends fasteners to the defendant who in turn performs the coating. The goods are then either shipped directly to the ultimate user or back to the manufacturer. In either case, the fastener boxes are stamped with the mark UNBAR before shipment.

Since January, 1972, the defendant has continued to electroplate fasteners for the automotive industry under the UNBAR mark. The vast majority of this business has involved electroplating fasteners which were owned either by the manufacturer or the ultimate user. In a few instances, however, Midwest owned the fasteners prior to application of the UNBAR process.

At present, the defendant's process is being used primarily on phillips round head self-drilling or steel tapping screws. The trademark application, however, specifies use on other types of threaded fasteners and would refer to any type of metal fastener or product that was susceptible to barrel plating.

Midwest's annual sales are approximately $2,500,000, of which approximately 10 percent is attributable to the UNBAR process.

The evidence concerning the defendant's advertising suggests that it has not engaged in any substantial advertising program. Midwest has distributed one flyer entitled, "UNBAR an Effective New Corrosion Resistant Chrome Coating for Small Carbon Steel Parts," and a reprint of an article that appeared in the August 17, 1972 issue of *Iron Age.* In addition, the defendant is listed in the Thomas Register under two categories of plating, but not as a manufacturer or supplier of fasteners. Similarly, the defendant is listed in the Detroit Yellow Pages Classified Directory under the listing for plating concerns.

The Patent Office proceeding under review here began on March 17, 1971 when Midwest filed an application to register the mark UNBAR for "corrosion resistant chrome plated threaded fasteners and other types of metal fasteners and coated products." 15 U.S.C.A. § 1051 (Supp.1976). After an initial determination that the mark should not be registered because it would be likely to cause confusion or mistake with reference to the plaintiff's registered mark, the examiner, upon reconsideration, concluded there was no likelihood of confusion. Pursuant to 15 U.S.C.A. § 1062 (Supp.1976), the mark was then published in the *Official Gazette of the Patent and Trademark Office.* See 37 C.F.R. § 2.80 (1975). Thereafter, the plaintiff filed a verified opposition to the registration alleging that it would be damaged by registration of the mark UNBAR on the principal register of the Patent Office. 15 U.S.C.A. § 1063 (Supp.1976). Notice of the opposition was then given to all parties and a three-member Trademark Trial and Appeal Board was convened to

decide the opposition. 15 U.S.C.A. § 1067 (Supp.1976).

Before the Board the plaintiff argued that registration of the mark UNBAR should be denied because it would create a likelihood of confusion with its mark, and because the defendant had never made *bona fide* use of the term UNBAR as a trademark for the goods recited in the application. In a thorough and well reasoned opinion, the Board concluded there was no likelihood of confusion between the two marks, and that the remaining issues were *ex parte* and should be referred back to the examiner with a recommendation that the examiner reevaluate Midwest's right to register UNBAR as a trademark *per se*. *Standard Pressed Steel Co. v. Midwest Chrome Process Co.*, 183 U.S.P.Q. 758, 765 (TT&AB 1974). The latter conclusion was premised on the Board's finding that Midwest had used the mark UNBAR as a mark for plating service and not for fasteners.

The plaintiff filed a notice of appeal of the Board's decision in the United States Court of Customs and Patent Appeals pursuant to 15 U.S.C.A. § 1071(a)(1) (Supp. 1976). The appeal was dismissed, however, when Midwest elected to have all further proceedings conducted by way of a civil action in this court as provided in Section 1071(b). Had the action remained in the Court of Customs and Patent Appeals, the court would have decided the appeal on the evidence produced before the Trademark Trial and Appeal Board. 15 U.S.C.A. § 1071(a)(4). Midwest's election, however, altered this procedure.

The review mechanisms of Section 1071 have been aptly described as unique. *Gillette Company v. "42" Products Ltd.*, 435 F.2d 1114, 1115 (9th Cir. 1971). Many courts refer to the procedure under Section 1071(b) as a *de novo* trial or proceeding. *See, e. g., Teter, Inc. v. Rheem Manufacturing Company*, 334 F.2d 784, 786 (7th Cir. 1964); *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 330 F.2d 667, 668 (7th Cir. 1964). Proceedings under this section are not strictly *de novo*, however, as that term is generally used. *See, e. g.,*

*Pittsburgh S.S. Co. v. Brown*, 171 F.2d 175, 178 (7th Cir. 1948); *Black's Law Dictionary*, 1677 (Rev. 4th ed. 1968). Thus while the parties are entitled to present new evidence before the district court and even enlarge the pleadings, the court is not totally free to disregard all that has happened before the Board. In *Fleetwood Company v. Hazel Bishop, Inc.*, 352 F.2d 841, 844 (7th Cir. 1967), the court stated,

It is likewise well settled that in an action to review a decision of the Patent Office Trademark Trial and Appeal Board, that decision must be accepted as controlling upon a finding of fact about confusing similarity of trademarks, unless the contrary is established by testimony which in character and amount carries thorough conviction. *Morgan v. Daniels*, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657 (1894); *Watkins Products, Inc. v. Sunway Fruit Products, Inc.*, 7 Cir., 311 F.2d 496, 498 (1962) . . . .

*Accord, Dow Corning Corp. v. Applied Power Industries, Inc.*, 322 F.Supp. 943, 944 (N.D.Ill.1970). Thus while the alternative review procedures under Section 1071(b) are designed to allow the litigants to produce new evidence, 1 J. McCarthy, *Trademarks and Unfair Competition*, § 1:20:4, at 765 (1973); *cf., Hoover v. Coe*, 325 U.S. 79, 87, 65 S.Ct. 955, 89 L.Ed. 1488 (1945), a district court is not free to substitute its judgment on questions of fact, such as likelihood of confusion, unless new evidence is adduced which is sufficient to produce a thorough conviction to the contrary of the decision of the Trademark Office. 2 J. McCarthy, *supra*, § 26.6, at 14; *see Fleetwood Co. v. Hazel Bishop, Inc., supra; Esso Standard Oil Co. v. Sun Oil Co.*, 97 U.S.App.D.C. 154, 229 F.2d 37, 40 (1956).

One final matter must be considered before turning to the substantive issues raised by the plaintiff's complaint. As noted earlier, the parties have filed cross motions for summary judgment. A dispute has arisen, however, regarding the proper manner of treating the motions. The plaintiff has submitted the administrative record and argues that the record warrants reversal of

the Board's decision. SPS further argues that it would be improper to grant the defendant's cross motion for partial summary judgment at this time because to do so would deprive the plaintiff of its right to introduce new evidence. Therefore, the plaintiff argues, the defendant's motion can be granted only if the court concludes as a matter of law that there is no new evidence of any sort which the plaintiff could introduce.

The defendant argues that the standard to be applied in determining whether its motion for summary judgment should be granted is whether there exists any genuine issue of material fact that must be resolved by trial. *Mintz v. Mathers Fund*, 463 F.2d 495 (7th Cir. 1972); *Kirk v. Home Indemnity Co.*, 431 F.2d 554 (7th Cir. 1970). And applying this standard, it is entitled to summary judgment as a matter of law.

■ Fed.R.Civ.P. 56(c) provides that summary judgment shall be granted to a moving party when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The modern view is that summary judgment in trademark cases can be granted on the same principles as in other cases. The distinguishing factor, however, is that trademark, like patent and copyright cases, generally involve questions of fact which cannot be resolved in a motion for summary judgment. 6 J. Moore, *Federal Practice* ¶ 56.17[66], at 56–1094–98 (2d ed. 1976). These principles are, of course, at odds with the position taken by the plaintiff, and consequently, its position is rejected.[2] If the defendant can establish that there is no genuine issue of material fact remaining for trial and that it is entitled to a judgment as a matter of law, an appropriate judgment will be entered. Any other rule would violate the express language of Rule

56(c), as well as the cases decided thereunder.

As noted earlier, the examiner and the three-member Trademark Trial and Appeal Board concluded that there was no likelihood of confusion between the marks UN-BAR and UNBRAKO. The plaintiff challenges this conclusion.

■ Under Section 1052(d) of the Trademark Act, no mark may be registered on the principal register if it "consists of or comprises a mark which so resembles one registered in the Patent and Trademark Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive . . . ." In a registration proceeding of this nature, likelihood of confusion is determined by comparing the goods identified in the subject application with the goods upon which the opposer has established prior use of its pleaded trademark or the goods recited in the opposer's pleaded registrations. *Standard Pressed Steel Co. v. Midwest Chrome Co., supra*, at 762; 1 McCarthy, *supra*, § 1:20:4, at 765.

The test for determining likelihood of confusion has been stated a number of ways in this circuit. In *Watkins Products, Inc. v. Sunway Fruit Products, Inc.*, 311 F.2d 496, 499 (7th Cir. 1962), the court stated: "We have also held that a trademark is confusingly similar to a prior trademark if it is similar in sound, appearance, or suggestive connotation." (Citations omitted.) And in *Independent Nail & Packing Co., Inc. v. Stronghold Screw Products, Inc.*, 205 F.2d 921, 924 (7th Cir. 1953), the court stated:

"Whether there is an infringement of a trade-mark does not depend upon the use of identical words, nor on the question as to whether they are so similar that a person looking at one would be deceived

---

**2.** Importantly, the plaintiff does not argue that it needs additional time to conduct discovery and thus produce additional evidence in support of its position. If that were the case, it would be inappropriate to deny the plaintiff

this opportunity by granting the defendant's motion even if it appeared there was no genuine issue of material fact. *See Lavin v. Illinois High School Association*, 527 F.2d 58, 61 (7th Cir. 1975).

into the belief that it was the other; but it is sufficient if one adopts a tradename or a trade-mark so like another in form, spelling, or sound that one, with a not very definite or clear recollection as to the real trade-mark, is likely to become confused or misled." *Northan-Warren Corp. v. Universal Cosmetic Co.,* 7 Cir., 18 F.2d 774, 775.

*Accord, National Van Lines, Inc. v. Dean,* 288 F.2d 5, 8 (7th Cir. 1961); *see Industrial Nucleonics v. Hinde,* 475 F.2d 1197, 177 U.S.P.Q. 386, 387 (C.C.P.A.1973).

Recently in *Union Carbide Corporation v. Ever-Ready, Inc.,* 531 F.2d 366 (7th Cir. 1976), the court enumerated a number of factors that should be considered in determining likelihood of confusion:

(1) The degree of similarity between the marks in terms of appearance, sound, and meaning;

(2) The similarity of products;

(3) The identity of advertising media used by the parties;

(4) The identity of purchasers or retail outlets;

(5) Whether there was an actual confusion between the two marks;

(6) The intent of the newcomer in adopting the mark in question;

(7) The distinctiveness of the opposer's mark.

*Id.* at 381–82. *See G. D. Searle & Co. v. Chas. Pfizer & Co., Inc.,* 265 F.2d 385, 388 (7th Cir. 1959); *Standard Oil Co. v. Standard Oil Co.,* 252 F.2d 65, 72 (10th Cir. 1958); *Dow Corning Corp. v. Applied Power Industries, Inc., supra,* at 946.

▮ Here the Board concluded that the two marks when considered as a whole are not so similar in sound, appearance and meaning that there existed a likelihood of confusion.[3] The basis for this conclusion, which is amply supported by the record, is not contradicted by any new evidence.

Mere side-by-side comparison of the marks, however, is not the test for likelihood of confusion. *National Van Lines, Inc. v. Dean, supra,* at 5 (7th Cir. 1961). Thus, while there is no genuine issue of material fact on the question of likelihood of confusion based on a side-by-side comparison, the remaining factors must be considered before a final conclusion on the issue of confusion can be made.

There are no issues of fact on the question of advertising. The Board found that SPS had extensively advertised its products through the distribution of catalogues, brochures, and other descriptive literature, as well as various trade publications. Midwest, on the other hand, has not conducted any large scale advertising; instead, it has distributed several pieces of descriptive literature, oné of which is the *Iron Age* reprint referred to earlier. Thus, while it is conceivable that the two parties will eventually compete in the same advertising media, there is no evidence that they do so now.[4]

▮ Next to the conclusion reached in the side-by-side comparison, the most crucial finding made by the Board in support of its decision was that, "the parties sell their goods and/or services to careful, sophisticated, and discerning customers under conditions and circumstances that insure discrimination in ascertaining the source thereof." *Standard Pressed Steel Co. v. Midwest Chrome Process Co., supra,* at 763. This finding is entirely consistent with the accepted principle that the greater the sophistication of the customer market, the less likelihood there is of confusion. 475 F.2d 1197, 177 U.S.P.Q. 386, 387 (Cust.&Pat. App.1973). Since there is sufficient evidence in the record to support the Board's finding on the nature of the customer market, and no evidence has been proffered to rebut the finding, the conclusion reached is

---

3. *Standard Pressed Steel Co. v. Midwest Chrome Process Co.,* 183 U.S.P.Q. 758, 763 (TT&AB 1974).

4. All the evidence indicates that the two parties do not compete in advertising: SPS's advertising is for fasteners, while Midwest to the extent it advertises, publicizes its plating process, not fasteners *per se.*

that there is no genuine issue of material fact on the question.

The next question is whether there was any actual confusion between the two marks. In *Union Carbide Corp. v. Ever-Ready, supra,* at 383, the court observed that while it is not necessary for a party to establish actual confusion, since the test is likelihood of confusion, "courts often view evidence of actual confusion as the best evidence of likelihood of confusion." *Accord, Watkins Products, Inc. v. Sunway Fruit Products, Inc.,* 311 F.2d 496, 499 (7th Cir. 1962); *Independent Nail & Packing Co. v. Stronghold Screw Prod. Inc., supra,* at 925. In the instant case, there is no evidence of actual confusion.[5] Because the Board correctly found on the basis of the evidence submitted that the parties were not presently in direct competition, the absence of actual confusion does not, however, advance the defendant's position, or correspondingly, damage the plaintiff's.

■ There is little to no evidence on the question of Midwest's intent in adopting the mark UNBAR. *Compare G. D. Searle & Co. v. Chas. Pfizer & Co., supra,* at 386. In his deposition, Patrick O. Berry, the President of Midwest, testified that prior to the institution of this lawsuit he had never heard of the UNBRAKO product line.[6] This information is of little help, however, without knowing both how the UNBAR mark was selected and who selected it. At most, all that can be concluded is that there is no evidence of bad faith on the part of Midwest. Absence of bad faith does not aid the defendant, however, because the "latecomer has a responsibility to avoid confusion." *Union Carbide Corp. v. Ever-Ready, supra,* at 382.

■ The final factor to be weighed is the distinctiveness of the plaintiff's mark. "A distinctive mark or name will be more broadly protected as a trademark, but general words or names, which have been applied to and used and registered as trademarks for a large number and variety of products, will be protected only with the range of use on similar goods." *Philco Corporation v. F. & B. Manufacturing Co.,* 170 F.2d 958, 961 (7th Cir. 1948), *cert. denied,* 336 U.S. 945, 69 S.Ct. 813, 93 L.Ed. 1102 (1949). *Accord, Union Carbide Corp. v. Ever-Ready, Inc., supra,* at 382. Here the plaintiff has utilized the mark UNBRAKO, a coined word, on a one-product line—fasteners. Under all the facts, the plaintiff's mark is distinctive and should be afforded the broader protection contemplated by *Philco* and *Union Carbide.*

The plaintiff has established that the parties deal in similar goods (based on the applicable registrations), that there is an identity of purchasers or sales outlets, and that its mark is distinctive and accordingly entitled to broader protection than a mark composed of general words. The defendant has established that when the marks are placed side-by-side, there is no likelihood of confusion, that while there is an identity of purchasers, they are sophisticated and discerning customers, and that there has been no actual confusion. The two other factors considered, intent and comparability of advertising, are essentially neutral; the evidence favors neither party.

■ Having reviewed the evidence in terms of the general test for confusion and the more specific factors enumerated previously, all that remains is to determine whether there is a likelihood of confusion. Applying the standards announced in *Fleetwood Company v. Hazel Bishop, Inc., supra,* and the general principles applicable to motions for summary judgment, the conclusion reached is that the plaintiff has not carried its burden of proof on the issue of confusion and therefore its motion for summary judgment is denied. Conversely, the defendant has carried its burden and is entitled to a judgment as a matter of law.

Two issues remain for consideration: first, whether the initial shipment of fas-

---

5. Deposition of Leonard Clark, June 12, 1975.

6. Dep. at 49.

teners was a *bona fide* and sufficient use upon which to base an application, 15 U.S.C.A. § 1127 (Supp.1976), and second, whether Midwest has ever engaged in any *bona fide* trade in commerce in fasteners under the trademark UNBAR as recited on the application. The Board concluded that both issues were *ex parte*[7] and should be considered on that basis "in order to determine whether any recommendation should be made to the Examiner of Trademarks on this matter in accordance with Rule 2.131." *Standard Pressed Steel Co. v. Midwest Chrome Process Co., supra,* 764. The Board then went on to state that "under this set of circumstances, it must be concluded that the initial shipment in commerce on which the subject application is predicated constitutes an insufficient basis or foundation for the registration of 'UNBAR' as a trademark for fasteners." *Id.* at 765. Further, the Board concluded that Midwest had not used the mark UNBAR as a trademark, and therefore, Midwest had acquired no rights in UNBAR for fasteners. *Id.* Due to the unusual procedure embodied in Rule 2.131, the Board did not enter a judgment or order that Midwest was not entitled to register the mark UNBAR for fasteners. Instead, the Board merely recommended that in the event Midwest ultimately prevailed on the *inter partes* issues that the Examiner of Trademarks reevaluate the defendant's right to register the mark UNBAR for fasteners *per se*. As a consequence of this recommendation the defendant argues and moves for summary judgment on the issue that the *ex parte* issue should first be decided by the Examiner of Trademarks. The plaintiff argues pursuant to Section 1071 all the issues in the opposition proceedings are before the court.

■ Although the question is far from clear, the cases suggest that under Section 1071(b), a district court has the authority to determine the registrability of an appli-

cant's mark. *See Durox v. Duron Paint Co.,* 320 F.2d 882 (4th Cir. 1963); *Quaker Oats v. General Mills,* 45 F.Supp. 462 (N.D. Ill.1942). The conclusion that the court has parallel jurisdiction with the patent office to determine registrability was based on the *de novo* nature of Section 1071(b) proceedings, the language of the section, and the language of Section 1119.

■ Section 1071(b) provides, "The court may adjudge that an applicant is entitled to a registration upon the application involved, that a registration . . . or such other matter as the issues in the proceeding require, as the facts in the case appear. Such adjudication shall authorize the Commissioner to take any necessary action, upon compliance with the requirements of law." Thus this section indicates that a district court can determine registrability even when some of the issues are *ex parte*. This conclusion is supported by Section 1119, which provides, "In any action involving a registered mark the Court may determine the right to registration . . . in whole or in part, . . . and otherwise rectify the register with respect to the registrations of any party to the action." In *Durox v. Duron Paint Co., supra,* the court held that this section authorizes a district court to determine the registrability of an applicant's mark even though it is determined there is no likelihood of confusion between the applicant's and the opposer's mark. The conclusion reached is that under the authority of *Durox* and the statutes previously referred to, a district court has authority to determine the registrability of an applicant's mark even when the issues of registrability might be termed *ex parte*. Therefore the defendant's motion for summary judgment is denied.

Having concluded that the registrability is properly before the court, we turn now to the question of whether the plaintiff is

---

**7.** An *ex parte* issue is one relating to the registrability of the mark itself—the nature of the mark and the use the applicant has made of it. "This is in contrast to a trademark's eligibility for registration vis-a-vis other marks (that is,

whether the mark is eligible for registration in view of specific rights of other parties)." Shanks, "The Ex Parte Issue in Inter Partes Trade Trademark Proceedings," 58 TM Rep. 1, 2 (1968).

entitled to summary judgment on the issue of nonregistrability.

 To register a trademark an applicant must state the first use of the mark in commerce. 15 U.S.C.A. § 1051 (Supp. 1976). "A trademark on goods is considered to be used in commerce when it is placed on the goods or their containers in any manner and the goods are then sold or transported in commerce. 15 U.S.C. § 1127 (1970)." *DeMert & Dougherty, Inc. v. Chesebrough-Pond's, Inc.*, 348 F.Supp. 1194, 1196 (N.D.Ill. 1972). Only a minimal amount of commerce in terms of either a sale or transportation will suffice, providing the transaction must not be a sham, and there must be a clear accompanying intent to engage in continuing commercial use in the future. *Blue Bell, Inc. v. Jaymar-Ruby, Inc.*, 497 F.2d 433, 436 & n. 9–10 (2d Cir. 1974). After reviewing all the materials, we are persuaded, although the question is close, that there is a material issue of fact on the question of the defendant's intent to use the trademark UNBAR as a mark for fasteners or merely as a service mark. Therefore the plaintiff's motion for summary judgment on this issue is denied.

In summary, the plaintiff's motion for summary judgment is denied in all respects for the reasons stated herein. The defendant's cross motion for partial summary judgment is granted on the issue of likelihood of confusion and denied on the issue of jurisdiction of the issue of use in commerce. The parties are ordered to appear at 9:30 a. m. on September 15, 1976 for a report on status and suggestions for proceeding to trial on the remaining issues in the lawsuit.