**PRO–FOOTBALL, INC., Plaintiff,**

v.

**Suzan Shown HARJO, et al., Defendants.**

**Civil Action No. 99–1385 (CKK/JMF).**

United States District Court, District of Columbia.

Feb. 27, 2002.

lobe atrophy, as well as other brain abnormalities.

Carolyn Beth Lamm, Francis Anthony Vasquez, Jr., White & Case, L.L.P., Washington, DC, Marc E. Ackerman, Robert Lloyd Raskopf, White & Case, New York City, Jack McKay, Washington, DC, for Plaintiff.

Aldo Noto, Dorsey & Whitney, L.L.P., Washington, DC, for Defendants.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This matter has been referred for discovery by Judge Kollar–Kotelly. Before me are defendants' motion to compel and plaintiff's two motions for protective orders.

In 1933, George Preston Marshall purchased a National Football League ("NFL") franchise located in Boston and moved it to Washington, D.C., whereupon he renamed the team the "Redskins." The franchise registered the first of a series of "Redskins" marks with the United States Trademark Office in 1967. In 1992, a group of seven Native Americans ("Native Americans") from an array of different tribes and nations petitioned the United States Patent and Trademark Office's Trademark Trial and Appeal Board ("TTAB") for cancellation of Pro–Football's federal trademark registrations involving the term "Redskin(s)." Seven years later, in April 1999, the TTAB ruled in favor of the Native Americans under Section 2(a) of the Lanham Act, 15 U.S.C.A. § 1052(a) (1997), finding that the term "Redskins" "may be disparaging of Native Americans to a substantial composite of this group of people" and "may bring Native Americans into contempt or disrepute." *Harjo v. Pro–Football, Inc.*, 1999 WL 375907, 50 U.S.P.Q.2d 1705, 1748 (1999) (*"Harjo II"*). Pro–Football subsequently filed the present action for *de novo* review under § 1071(b) of the Lanham Act, seeking to overturn the TTAB's ruling.

At the same time the TTAB handed down its decision, the Estate of Jack Kent Cooke (a long-time owner) was in the process of selling the franchise. One purchase bid in January 1999 for a reported $800 million was rejected by the NFL, which held a veto over any proposed sale. In May 1999, one month after the TTAB ruling, a bid by the Daniel M. Snyder Ownership Group, also estimated at $800 million, was approved by the NFL, and the purchase closed in July 1999.

## DISCUSSION

### The Native Americans' Motion to Compel

In order to counter Pro–Football's laches defense, the Native Americans seek information relating to the worth of the Redskins marks. The laches defense originally was rejected on equitability grounds by the TTAB in a pretrial ruling. *Harjo v. Pro–Football, Inc.*, 1994 WL 262249, 30 U.S.P.Q.2d 1828 (1994) (*"Harjo I"*). When Pro–Football once again pleaded laches in its 1999 complaint, the Native Americans sought to strike the defense in a motion for judgment on the pleadings. Judge Kollar–Kotelly ruled that the defense survived the motion for judgment on the pleadings. Reading Pro–Football's allegations as true, the judge concluded that plaintiff had satisfied the three common

law requirements of such a plea: "(1) the Native Americans delayed substantially before commencing their challenge to the 'Redskins' trademarks; (2) the Native Americans were aware of the trademarks during the period of delay; and (3) Pro–Football's ongoing development of goodwill during this period of delay engendered a reliance interest in the preservation of the trademarks." *Pro–Football, Inc. v. Harjo*, 2000 WL 1923326, *5–6 (D.D.C. Dec. 11, 2000) ("Mem.Op."). However, Judge Kollar–Kotelly deferred ultimate resolution of the laches issue to a later time, once the record was expanded beyond those facts alleged in the pleadings. *Id.* at *6–7.

**The Scope of Discovery**

Pro–Football takes a strange approach to discovery. First, it dismisses out of hand any obligation to produce evidence that the Redskins marks have a distinct or specific monetary value. In the same breath, however, it advises the Native Americans that:

> To the extent the Redskins intend to introduce general evidence to buttress its laches claim such as expert testimony on the value of the brand or witness testimony confirming the continuous use and promotion of the Redskins Marks throughout the period of delay—Defendants can seek appropriate depositions, without the wholesale financial discovery sought here.

*Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Compel Discovery* ("P.Mem.") at 7. *See id.* at 10 ("The Redskins will present general evidence of the development and promotion of the Redskins Marks, will produce any such documents to Defendants, and will provide Defendants with ample opportunity to depose any such witnesses.").

■ While Pro–Football may try to dictate the pace of a football game, it cannot control the scope of discovery by limiting its opponents to rebutting only what Pro–Football chooses to prove concerning what it calls the "value of the brand." The very purpose of discovery is to force a litigant to disclose relevant material in its files so that its opponent can press a case, using whatever legal or factual theory the opponent sees fit to use. It borders on the fatuous to suggest, for example, that documents bearing on how the holder of a mark values that mark are not discoverable in litigation devoted to ascertaining how the holder will be prejudiced by the cancellation of the mark. Pro–Football would be delighted to present evidence that they have persistently carried the value of the mark on their books as a million dollars. This information is no less discoverable if they have instead carried that value as $1 but have no intention of presenting that evidence.

**Discovery and Laches**

■ The Native Americans assert that, because a laches argument requires a showing of economic prejudice, they are entitled to broad discovery of Pro–Football's financial records. Pro–Football responds that specific evidence of such prejudice is not required to prevail on the laches claim, and therefore its financial records are irrelevant and confidential.[1]

---

1. Pro–Football claims that the requested documents are confidential and therefore additionally shielded by Fed.R.Civ.P. 26(c)(7). However, it offers no explanation of why the Stipulated Protective Order fails to meet these confidentiality concerns except to speculate that someone may violate it. Note that I also reject Pro–Football's claim that production of

the materials sought will be burdensome due to Pro–Football's failure to make a specific showing, supported by declaration, as to why the production sought would be unreasonably burdensome. *Natural Resources Defense Council v. Curtis*, 189 F.R.D. 4, 13 (D.D.C. 1999); *Athridge v. Aetna Cas. & Sur. Co.*, 184 F.R.D. 181, 191 (D.D.C.1998).

■ A laches defense requires the party asserting the claim to show that its interests have been prejudiced by plaintiff's delay in asserting its rights. *Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Ouest De La France*, 245 F.3d 1359, 1361 (Fed.Cir.2001); *N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Educational Fund, Inc.*, 753 F.2d 131, 137 (D.C.Cir.1985); *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C.Cir.1982). Prejudice may be against a party's economic interests or trial interests. *Bridgestone*, 245 F.3d at 1362.[2] The crux of the present dispute is whether the showing of economic prejudice must consist of specific, quantitative evidence. Plaintiff submits that general evidence showing the franchise's continuous use of the mark, along with portions of its complaint avowing the "millions of dollars" in and "tremendous value" of the marks, satisfies the economic prejudice requirement.[3] Defendants contend that plaintiff's use of the mark is but the departure point for a detailed inquiry into the precise value of the marks.

■ In *Bridgestone*, the Federal Circuit followed its earlier opinion in *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed.Cir.1992). *Aukerman* distinguished laches from equitable estoppel on the grounds, *inter alia*, of the necessity of establishing reliance. Equitable estoppel cannot be invoked unless there has been a shift of position in reliance upon the conduct of the party to be estopped. *Id.* at 1041. On the other hand, laches can exist even though the party asserting it did not change its position in reliance on the other party's delay. It suffices to show prejudice in the form of loss of money that would not have been invested had the other party not delayed in asserting its rights. This is economic prejudice, which the party invoking the laches defense must show. *Id.* at 1032.

In *Bridgestone*, what the Federal Circuit called "the Automobile Club" sought to cancel the use of the Le Mans mark for tires that Bridgestone sold because the mark suggested an association between the tires and the famous road race the Automobile Club sponsored. The TTAB granted the application and, in a footnote of its opinion, stated:

n. 5 The only affirmative defenses maintained by Bridgestone in its brief were "laches" and "estoppel by laches." The record does not reflect evidence on these defenses; and in Bridgestone's brief, it stated only very general information about its alleged reliance on the Automobile Club's delay in seeking can-

---

2. Plaintiff claims both economic and trial prejudice. Although both forms of prejudice may be considered when the Court ultimately takes up the merits of the laches defense, the present discovery dispute concerns only economic prejudice. For the purposes of determining relevance, the strength of plaintiff's trial prejudice claim is a non-issue, for the Court will likely consider both forms of prejudice in weighing the interests of each party.

3. Judge Kollar–Kotelly's December 11, 2000 Opinion in no way reflects a finding of fact as to the value of these marks. Rather, she was merely restating the allegations set forth in plaintiff's complaint. Similarly, the TTAB struck the laches defense from the case, and

its opinions in *Harjo I* and *Harjo II* do not address the worth of the marks. The statements in both opinions generally describing how the public associates the Redskins mark with the professional football franchise, which has a devoted following, hardly constitute the "the law of the case." Neither court's discussions of the widespread association of the Redskins mark with a football team, which served as an introduction to their actual holdings, resolved a specific question of law. *See LaShawn v. Barry*, 87 F.3d 1389, 1392 (D.C.Cir.1996)(en banc)(law of case bars (1) revisiting on second appeal issues resolved on first and (2) lower court disregarding decisions of superior court).

cellation of Bridgestone's registration. For example, Bridgestone stated that "... in reliance on the lack of any objection for so many decades, Firestone has designed, marketed, and sold many tires under the name LEMANS"; and "Firestone would obviously not have invested so much time and money in its LEMANS tires had [the Automobile Club's] objections been timely raised...."

Bridgestone provided absolutely no specific information regarding its alleged reliance on the Automobile Club's alleged silence. While it is clear that there has been a delay in seeking cancellation of Bridgestone's registration, Bridgestone has not proven the elements of the affirmative defenses of laches and estoppel by laches.

*Bridgestone*, 245 F.3d at 1361.

Noting that it was "undisputed that Bridgestone invested in and promoted the LEMANS brand tires over this lengthy period, during which the Automobile Club was silent," the Federal Circuit chastised the TTAB for confusing the reliance element of laches with the reliance element of equitable estoppel:

> The Board's requirement of "specific" evidence of "reliance" on the Automobile Club's silence could relate to proof of estoppel, but it does not apply to laches. When there has been an unreasonable period of delay by a plaintiff, economic prejudice to the defendant may ensue *whether or not the plaintiff overtly lulled the defendant into believing that the plaintiff would not act, or whether or not the defendant believed that the plaintiff would have grounds for action. See A.C. Aukerman Co.*, 960 F.2d at 1042, 22 USPQ2d at 1336 ("reliance is not a requirement of laches but is essential to equitable estoppel"). Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821, 52 USPQ2d 1065, 1072 (7th Cir.1999) (the longer the use and the lengthier the period of delay, the lighter the burden of showing economic prejudice in support of the defense of laches). Bridgestone's evidence of undue delay and prejudice was uncontroverted by the Automobile Club. The Board's ruling rested on an erroneous interpretation of the law of laches, leading to an unreasonable exercise of judgment. Thus the Board's rejection of the defense of laches was an abuse of discretion. That ruling is reversed.

*Id.* at 1362 (emphasis added).

As is obvious when one views the entire quotation, the Federal Circuit was criticizing the TTAB for using the reliance factor as it is defined for the purposes of estoppel—a change of position in reliance on the other party's conduct—and concluding that that showing was also necessary to the defense of laches. It is this narrow sense of the term "reliance" that *Bridgestone* and *Aukerman* employed in holding that reliance was not a requirement of laches. It hardly follows that a specific showing of how the loss of the mark will harm its holder is irrelevant when the holder claims laches.

Indeed, rather than disavowing the need for specific evidence of prejudice, *Aukerman* affirms its importance in overcoming a presumption of laches. *Id.* at 1034–1039. Other cases also affirm the operation of this presumption, but do not treat it as irrebuttable. *See, e.g., N.A.A.C.P.; Hot Wax; University of Pittsburgh v. Champion Prods., Inc.*, 686 F.2d 1040 (3rd Cir. 1982). In addition, cases that discuss economic prejudice sometimes detail the magnitude of plaintiff's interest with specific

dollar figures. *See, e.g., Chubb Integrated Systems, Inc. v. National Bank of Washington,* 658 F.Supp. 1043, 1049 (D.D.C. 1987).

Furthermore, if a showing of economic harm is appropriate to advance a laches defense, then it must follow that a showing of a lack of economic harm may defeat that defense. It then follows that the Native Americans in this case have to the right to see what value is given the mark in Pro–Football's books and records to defeat the claim of economic prejudice. Pro–Football cannot simply "presume" away the Native Americans' right to assert that there will be no real economic prejudice if the use of the mark is barred. That there is a self-evident association in the public mind between the popular football team and the mark does not in itself preclude the Native Americans from examining documents that pertain to the monetary value of the mark in the Redskins' books and records. Such records are, in fact, a particularly appropriate place to look.

**Equity and Discovery**

Additionally, the principle of equity compels the court to tailor its analysis to the demands of the particular case. As a general matter, specific valuation of the disputed marks aids the district judge in balancing the holder's interests in using the mark against the challenger's interest in prohibiting its use. That one could conjure a case in which a court of equity could find specific evidence unnecessary does not negate the utility of such specific evidence in the ordinary case. Where a party's interests may be capable of being economically quantified, it is only logical that such quantitative information be considered in an attempt to reach the most equitable decision.

Moreover, Judge Kollar–Kotelly's Opinion of December 11, 2000 contemplates the receipt of quantitative evidence of Pro–Football's reliance interest. After stressing the equitable nature of laches, she stated that:

[the laches doctrine's] applicability is dependent upon the equities of the factual scenarios within which it is raised. Thus, while it is possible that the competing interests at stake in this litigation may counsel against allowing a laches defense (as the TTAB determined), reaching that conclusion requires a *careful assessment of the interests that each party seeks to advance.*

At this early stage in the litigation, when the Court's review is strictly limited to the facts as alleged in the complaint, the parties have not had an opportunity to present the Court with any *detailed information about the interests that underlie their respective positions.*

Mem. Op. at 13 (emphasis added).

In calling for "detailed information" and a "careful assessment," Judge Kollar–Kotelly no doubt expects more than a simple reiteration of Pro–Football's complaint allegations. Rather, her opinion indicates that she intends not only to identify each party's interests, but to deliberately weigh the magnitude of those interests. If we are to accept Pro–Football's view of the level of detail required, there would have been no need for Judge Kollar–Kotelly to defer the ultimate resolution of the laches issue in order to gather additional information.

That Judge Kollar–Kotelly anticipates a detailed showing of economic prejudice is especially significant in light of the widely-recognized discretion that district judges may exercise in entertaining a laches defense. *See, e.g., Aukerman,* 960 F.2d at 1032; *Hot Wax, Inc.,* 191 F.3d at 819. Because district judges possess broad discretion in ruling on a laches claim, it follows that they should possess equally broad latitude in determining what level of

evidence they shall require to support the claim.

### Examination of Individual Requests

█ Having concluded that defendants are entitled to production of specific information relevant to the value of the Redskins marks, I must next determine which of the Native Americans' many interrogatories and document requests are truly relevant. One key dispute is whether documents prepared in connection with the sale of the franchise in 1999 are relevant to a claim that defendants originally filed in 1992. Plaintiff seeks to bar these documents as outside the relevant time frame for weighing the respective interests of each party. Plaintiff urges that the proper question is the relative value of each party's interests as of 1992, when defendants first sought the marks' cancellation. Defendants maintain that the 1999 documents offer the most up-to-date valuation of the marks, as well as an irreplaceable opportunity to evaluate their precise value, given that the first bid was submitted just prior to the TTAB ruling cancelling the mark and the second bid was approved and completed shortly after the TTAB ruling.

The relevance of the 1999 documents hinges in part on the type of proceeding before this Court. The Lanham Act offers parties two separate avenues for challenging a TTAB decision. Under 15 U.S.C.A. § 1071(a), the challenging party may file a formal appeal with the Court of Appeals for the Federal Circuit. As an ordinary exercise of administrative review, the Federal Circuit is limited to the record before the trial court. Alternatively, 15 U.S.C.A. § 1071(b) allows for what has been termed *de novo* review by the United States District Court. Under this type of review, the parties may introduce new evidence and even enlarge the pleadings. *Schmidt v. Quigg,* 609 F.Supp. 227, 228 (E.D.Mich. 1985); *Standard Pressed Steel Co. v. Mid-*

*west Chrome Process Co.,* 418 F.Supp. 485 (N.D.Ill.1976). Although the District Court must still afford deference to the TTAB's findings of fact, legal conclusions may be considered *de novo*. Given the *de novo* nature of this action, I conclude that evidence from 1999 is within the relevant time frame for considering the parties' interests. If Judge Kollar–Kotelly affirms the TTAB and Pro–Football loses the mark, the economic harm it suffers will occur in 2002. Information about the value of mark that is closer to 2002 is surely as relevant as information concerning the value of the mark in 1992.

In light of my above conclusions, all documents and interrogatory responses related to the value of the Redskins marks shall be produced. This includes documents generated after 1992, such as those connected with the sale of the franchise in 1999. In particular, plaintiff must respond to:

- Interrogatory # 4—all persons who are/were licensed to use the marks since 1967
- Interrogatory # 6—all persons with knowledge of the value of the marks
- Interrogatory # 7—all current uses of the marks
- Document Request # 8—documents that detail expenditures alleged in paragraph 106 of the Complaint
- Document Request # 14—documents generated since 1999 relating to negotiations with media regarding remuneration for the right to use the marks
- Document Request # 15—documents showing fees, royalties or other remuneration actually received by the franchise since April 1, 1999 in exchange for the use of the marks
- Document Request # 16—documents that refer or relate to the value of the marks

- Document Request # 17—documents that refer or relate to the effect of cancellation of the marks on the value of the marks
- Document Request # 19—documents that refer or relate to the effect of cancellation of the marks on the value of the franchise
- Document Request # 20—documents that refer or relate to the value of the benefits that the franchise will lose if one or more of the marks are cancelled
- Document Request # 21—documents that refer or relate to expectations of the franchise or its owners for future revenues attributable to the marks
- Document Request # 22—documents that refer or relate to statements made by the franchise or its owners or agents that concern the marks [4]
- Document Request # 29—documents connected to any sale or attempted sale of the franchise since 1977 that refer or relate to the marks, the impact of the litigation on the value of the marks, goodwill associated with the marks, the possible changing of the team name, or any economic arrangement that refers or relates to the marks [5]

On the other hand, some of defendants' requests are not sufficiently connected to the worth of the marks to justify production. The following requests, as paraphrased, fall into this overly broad category:

- Interrogatory # 9—all persons who performed audit services for the franchise since 1966

- Interrogatory # 10—the persons empowered to negotiate for the sale of the team following Jack Kent Cooke's death in 1997
- Document Request # 5—financial and income statements for the franchise
- Document Request # 6—documents organized by revenue source
- Document Request # 7—documents that detail the franchise's revenues
- Document Request # 9—documents that detail expenditures for goodwill other than that specifically association with the marks
- Document Request # 10—documents relating to purchase negotiations of the naming rights for any asset of the franchise
- Document Request # 11—credit, loan or guarantee documents that refer to the litigation or the marks
- Document Request # 12—documents related to financing negotiations
- Document Request # 13—audit-related documents
- Document Request # 18—documents that refer or relate to the value of the franchise since 1966
- Document Request # 23—documents that refer or relate to the negotiations for the purchase of the franchise by its current owners
- Document Request # 24—documents that refer or relate to the negotiations for purchase of the franchise by Howard Milstein or any other person

---

4. Document Request # 22 is actually much broader, asking for all documents that refer or relate to statements made by the franchise or its owners or agents that concern not only the marks, but also the litigation and the name of the franchise. I require that only those documents containing statements made about the worth of the marks must be pro- duced, and not documents that include statements about the litigation in general. Plaintiff shall redact as needed.

5. As with Document Request # 22, plaintiff need only produce documents relating to the value of the marks.

- Document Request # 25—documents receive from the NFL regarding the evaluation of the bid or bids by Howard Milstein, the Daniel M. Snyder Ownership Group, or any other person for the purchase of the franchise
- Document Request # 26—all documents presented to the potential bidders or buyers of the franchise from 1997 to the present
- Document Request # 27—documents received in response to the offering memoranda identified in Document Request # 26
- Document Request # 28—documents relating to the evaluation of bids to purchase the franchise
- Document Request # 30—documents pertaining to the marketing strategy for the franchise generated since the initiation of the Daniel M. Snyder Ownership Group's negotiations to purchase the franchise

I note that the above interrogatories and document requests may not be entirely ignored by plaintiff. Rather, any documents that include information pertaining to the value of the marks must be turned over. Where necessary, general financial data that includes information regarding the value of the marks may be redacted, so long as the redactions do not render the marks-related information unintelligible.

## Non–Party Subpoenas

In a separate motion for a protective order, Pro–Football seeks to block the Native Americans' third-party subpoenas *duces tecum* requesting documents relating to plaintiff's financial worth. Defendants have served subpoenas on Morgan Stanley Dean Witter & Co. and S.G. Cowen Securities Corp. The Estate of former Pro–Football owner, Jack Kent Cooke, retained Morgan Stanley as its investment bank in 1997 in connection with the proposed sale of the franchise. The Daniel M. Snyder Ownership Group purchased the

franchise in 1999 and retained S.G. Cowen to finance the deal. Defendants seek documents generated by these advisors that will help determine the value placed upon the Redskins marks. Many of the requested documents are similar in nature to those requested directly from plaintiff, and plaintiff's objections are consistent with those stated in its opposition to the motion to compel.

## Privilege Claims

Plaintiff also contends that the requested documents are protected by both the attorney-client and the work-product privileges, as any valuation of the Redskins marks would likely include an attorney's assessment of the probability of success of the ongoing litigation with defendants. This claim is incomplete, however, for plaintiff seems to be making a theoretical, not an actual, argument for these privileges. Furthermore, there are no supporting affidavits detailing the nature of the disputed documents, as required by *In Re Shaw Pittman*, 2000 WL 1580968 *1 (D.C.Cir.2000). It is also doubtful that predictions of the success of this litigation were made for the primary purpose of preparing for the litigation.

Without making any legal conclusions, I have read Pro–Football's motion for a protective order as if plaintiff had standing to intervene in the discovery served upon these non-parties. I shall order that all documents in the custody of Morgan Stanley or Stanley Cowen that refer or relate to the value of the disputed marks be produced. In contrast, documents that only relate to the sale of the franchise need not be produced.

## Deposition of Daniel M. Snyder

Pro–Football seeks to quash the deposition of Daniel M. Snyder ("Mr.Snyder"), the lead partner in the group that purchased the franchise in 1999. The Native Americans seek Mr. Snyder's testimony on

three subjects: (1) Pro–Football's claims and defenses, (2) whether the term "Redskins" is disparaging, and (3) the value of the marks, which I have now concluded is the only pertinent issue in the laches inquiry that Judge Kollar–Kotelly is about to undertake. I will permit Mr. Snyder to be deposed but only as to the topics I have identified in this memorandum as the proper subjects of inquiry and that focus exclusively on the value of the mark.

In particular, the following topics are offered as a guide to both parties as to the sort of questions that may be asked. I emphasize that these topics are in no way intended to comprise an exhaustive list of allowable topics, but only suggest the limitations on discovery I have already exposed.

● Mr. Snyder's understanding regarding the values of the marks during the course of his negotiations for the purchase of the franchise;

● the information upon which Mr. Snyder based his understanding of the values of the marks; and

● the values attributed to the marks in any proposed and final purchase prices.

The parties shall jointly contact my law clerk and schedule the deposition at a time when I will be available. During the deposition, if I am advised by telephone that the Native Americans' counsel has exceeded the limitations I have set, I will stop the deposition immediately.

A separate Order accompanies this Memorandum Opinion.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is therefore, hereby,

**ORDERED** that the Native Americans' *Motion to Compel Discovery* [# 43] is **GRANTED IN PART AND DENIED IN PART**. In particular, Pro–Football shall respond to Interrogatories # 4, 6, and 7 and Document Requests # 8, 14, 15, 16, 17, 19, 20, 21, 22 and 29. Furthermore, Pro–Football shall respond to Interrogatories # 9 and 10 and Document Requests # 5, 6, 7, 9, 10, 11, 12, 13, 18, 23, 24, 25, 26, 27, 28, and 30 to the extent that it possesses information pertaining to the value of the Redskins marks, which is responsive to these Interrogatories and Document Requests. It is further, hereby,

**ORDERED** that Pro–Football's *Motion for a Protective Order Limiting Disclosure of Pro–Football's Documents Possessed by Morgan Stanley Dean Witter & Co. and S.G. Cowen Securities Corp.* [# 46] is **GRANTED IN PART AND DENIED IN PART**. In particular Morgan Stanley Dean Witter & Co. and S.G. Cowen Securities Corp. must produce information pertaining to the value of the marks, consistent with the limitations discussed in the accompanying Memorandum Opinion. Finally, it is, hereby,

**ORDERED** that Pro–Football's *Motion for a Protective Order Quashing the Deposition of Daniel M. Snyder* [# 48] is **GRANTED IN PART AND DENIED IN PART**. In particular, the Native Americans may depose Mr. Snyder only with respect to the values of the marks, consistent with the limitations discussed in the accompanying Memorandum Opinion.

**SO ORDERED.**